Joon Il PARK, et al., Petitioners,

v.

DISTRICT OF COLUMBIA ALCOHOL-
IC BEVERAGE CONTROL
BOARD, Respondent.

No. 86-682.

District of Columbia Court of Appeals.

Submitted Feb. 23, 1989.
Decided March 24, 1989.

Bernard C. Dietz, Washington, D.C., was on the brief for petitioners.

Frederick D. Cooke, Jr., Corp. Counsel, Charles L. Reischel, Deputy Corp. Counsel, Lutz Alexander Prager, Asst. Deputy Corp. Counsel, and Charlotte M. Brookins, Asst. Corp. Counsel, Washington, D.C., were on the brief for respondent.

Before NEWMAN and TERRY, Associate Judges, and KERN, Senior Judge.

TERRY, Associate Judge:

After a hearing at which petitioners were present, the Alcoholic Beverage Control Board denied their application for a Class B retailer's license.[1] Petitioners contend that the Board's action was not supported by substantial evidence, that the Board erred in denying their request to reopen the record, and that the hearing was incurably tainted when a Board member mentioned an *ex parte* conversation with the principal of a school located near petitioners' store. We affirm.

## I

Petitioners, Mr. and Mrs. Park, are the owners of the Corner Market, a "mom and pop" convenience store on 20th Street, N.E., just south of Benning Road. The store carries fresh fish, chicken, and other grocery items for its regular customers, the residents of the neighborhood, as well as various snack foods and chips for purchase by school children and people who work nearby. Mr. Park told the Board that he and his wife applied for a Class B license mainly to accommodate the regular customers who buy chicken and fish.

Petitioners' application was opposed in writing by the District of Columbia Board of Education and by Advisory Neighborhood Commission (ANC) 6A.[2] In addition, Robert Boyd, the elected Board of Education member from Ward 6, where the market is located, and Frances Queen, a member of ANC 6A, both testified at the hearing. Their opposition was based on the market's proximity to the Blow Elementary School, the number of Class A and Class B licensees already operating in the neighborhood, and the serious litter problem in the vicinity of the market, particularly around the schoolyard.

The evidence showed that the rear of the market and the schoolyard were separated by an alley only ten feet wide. The distance from the front entrance of the market (where customers enter and exit) to the nearest opening in the chain-link fence surrounding the schoolyard[3] was about forty-five feet. The opponents of the application asserted not only that the market was too close to the school to be selling alcoholic beverages, but that the alley, through which children walked on the way to and from school, was populated by loiterers, vagrants, and drunkards who would be further encouraged to hang around if a ready supply of beer and wine became available at the Corner Market.[4] Moreover, the area around the school already contained four Class A licensees, two Class B licensees, and one Class C licensee.[5] Finally, the large amount of litter in and around the school playground was described by Mr. Boyd, Mrs. Queen, and Garland Cheek, an investigator for the Board who visited the school seven times. On his first visit Cheek noted that the playground was strewn with litter, including broken glass, milk cartons, bags, and "just about anything you can imagine." On subsequent visits he repeatedly saw the playground strewn with broken glass, beer cans, and beer bottles, all of which made the play

---

1. A Class B retailer's license permits the licensee to sell beer and wine in closed containers for consumption off the premises. D.C.Code § 25–111(a)(6) (1981).

2. The ANC voted unanimously (8–0) to oppose the application.

3. The nearest opening is a four-foot break in the fence.

4. Mr. Boyd testified that, as alleys go, this one was "not a very desirable alley." Mrs. Queen, who lives only three blocks from the Corner Market, testified that "winos" and "derelicts" congregate in a vacant lot near the market and seek shelter in abandoned cars that grace the alley.

5. The Superette Market, one of the two Class B retailers, is located about 368 feet from the Blow Elementary School.

area unusable and dangerous. Mr. Boyd said that the litter was so voluminous and accumulated so rapidly that the school's maintenance crew could not keep up with it. Mrs. Queen supplemented her testimony with several photographs of the area, some of which showed the trash in the schoolyard, the cars in the alley, and the derelicts in and around the vacant lot.

## II

■■■ We must uphold the Board's decision if it is in accordance with law and supported by substantial evidence on the record as a whole. D.C.Code § 1–1510(a)(3)(E) (1981). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938) (citations omitted). We readily conclude that the Board's decision here was supported by substantial evidence, namely, the testimony of three witnesses and the photographs supplied by Mrs. Queen.

In its order denying petitioners' application, the Board found that the Blow Elementary School was less than forty-six feet from petitioners' store; that the school playground was "littered with broken glass, beer bottles, beer cans, and soda bottles"; and that in the immediate area seven businesses already held Class A, Class B, or Class C retailer's licenses. These findings were supported by testimony from the Board's own investigator, who visited the area on several occasions over a period of seven months, as well as from Mrs. Queen and Mr. Boyd. Mrs. Queen gave a vivid description of the "loiterers" and "winos" who hang out in the alley

between the Corner Market and the Blow Elementary School—an alley that is often traversed by young children. Furthermore, the unanimous recommendation of ANC 6A was made part of the record and considered by the Board. The ANC opposed petitioners' application because the market was "too close to a public school." The Board is obliged to give the ANC's recommendation "great weight." D.C. Code § 1–261(d) (1981); *see Kopff v. District of Columbia Alcoholic Beverage Control Board*, 381 A.2d 1372, 1383–1385 (D.C.1977). That was an easy task in this case, for the ANC's recommendation was supplemented by the testimony of one of its members, Mrs. Queen, who graphically described the alley and its environs on the basis of her own personal observations.

Petitioners assert that the beer bottles and cans obviously could not have come from their store because they were not licensed to sell beer, and that a petition in support of the application was signed by 130 people while no written objections were filed by nearby property owners. These assertions may be true, but they have no effect on our decision. Even assuming that there was substantial evidence on petitioners' side which would support approval of their application, we must nevertheless accept the Board's findings and affirm its denial of petitioners' application because they too are supported by substantial evidence. *Upper Georgia Avenue Planning Committee v. Alcoholic Beverage Control Board*, 500 A.2d 987, 992 (D.C.1985) (citing cases); *see Consolo v. Federal Maritime Commission*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026–27, 16 L.Ed.2d 131 (1966); *NLRB v. Nevada Consolidated Copper Corp.*, 316 U.S. 105, 62 S.Ct. 960, 86 L.Ed. 1305 (1942).[6]

---

**6.** Petitioners' argument that the Board erred in denying their request to reopen the record is also meritless. At the hearing, Mr. Boyd and Mrs. Queen indicated their desire to improve conditions around the school by protesting the license of the Superette Market when it came up for renewal or by opposing other applications when they came before the Board for hearing. Petitioners' sole reason for wanting the record reopened was to find out if such challenges were made. There is, however, not a scrap of evidence to suggest that the Board considered

these statements by Boyd and Queen in deciding to deny petitioners' application. Moreover, it is uncontroverted that petitioners' market was closer to the school property than any of the other businesses that sold alcoholic beverages, separated from it only by a ten-foot alley. That difference alone justified the Board's decision to deny petitioners' application, regardless of any action taken against other applicants or licensees. *Cf. Allen v. District of Columbia Hackers' License Appeal Board*, 471 A.2d 271, 275 (D.C. 1984) (differently situated persons may be treat-

### III

Petitioners next argue that they were denied a fair hearing because Harry Thomas, a Board member, made an allegedly prejudicial comment during the proceedings. At the end of Mr. Cheek's testimony, shortly after petitioners had introduced some photographs into the record, Mr. Thomas asked:

> I have a question. I wonder why you would pick 6:00 o'clock in the morning to do an investigation before school was open. I think Mr. [Lawrence] Hill is the acting principal at Blow Elementary School now, and I talked to Mr. Hill about the problems of loitering in that neighborhood, and I don't think the pictures give us a true picture of the situation in that block of Benning Road or my observation as a citizen who lives in the neighborhood, that the pictures are not a true picture of what really are the activities.
>
> ... And I know there are problems in that neighborhood with drugs and prostitution and all kinds of things.

Petitioner contends that in making this statement Thomas improperly related the results of his personal investigation to the other Board members, and that the other members in turn improperly relied upon Thomas' statement in reaching their decision.

After petitioners' brief was filed, the Board moved to remand the record in this case so that the circumstances of Mr. Thomas' conversation with Mr. Hill might be more fully developed. We granted the motion and remanded the record with a request to clarify when and how the conversation with Mr. Hill took place and what was discussed. In response to our request, Mr. Thomas explained that while he was a member of the Alcoholic Beverage Control Board,[7] he also served on one of the ANCs in Ward 5.[8] In his role as an ANC representative, Mr. Thomas said, he "made it

[his] business" to keep informed about local affairs, including undesirable conditions near the Blow Elementary School. He thus happened to have a "brief, chance conversation" with Mr. Hill about the problem of drug dealers and users in the area near the school—a conversation in which "[t]he subject of [petitioners'] application came up casually" as one topic among several that they discussed.

■ According to the "multiple-hat" rule, it is not *per se* improper for an official who holds two governmental positions, as Mr. Thomas did, to become involved in both the investigation and determination of the same case; rather, "[t]he question of incompatibility ... must be examined on a case by case basis." *Citizens Ass'n of Georgetown v. District of Columbia Alcoholic Beverage Control Board*, 359 A.2d 295, 298 (D.C.1976). Thomas' investigation of conditions around the Blow Elementary School and his remarks about those conditions at the hearing cannot be a ground for reversal unless petitioners can show that the positions Thomas held were so incompatible as to overcome the presumption that the Board members acted fairly in ruling on his application for a license. *Id.* at 298–299; *see also Withrow v. Larkin*, 421 U.S. 35, 47–55, 95 S.Ct. 1456, 1464–69, 43 L.Ed.2d 712 (1975). Petitioners have not done so, nor can they in light of Mr. Thomas' response to our remand. That response shows that his conversation with Mr. Hill arose from an unrelated matter and was motivated by his desire to serve effectively as an ANC member.

■ In any event, it is not improper for a Board member to become familiar with the surroundings in which a potential licensee will operate by personally inspecting the site, so long as the information obtained by such an inspection is placed on the record at the hearing, and the applicant is given an opportunity to controvert it by other

---

ed differently if there is "at least one significant reason for the disparity").

7. Mr. Thomas, who is no longer on the Board, currently sits on the District of Columbia Council.

8. Ward 5 is immediately north of Ward 6. In the area at issue here, the dividing line between the two wards is Benning Road, which is less than a block from the Corner Market.

evidence or argument. *Citizens Ass'n of Georgetown v. District of Columbia Alcoholic Beverage Control Board,* 288 A.2d 666, 670–671 (D.C.1972); *see Northeast Liquors, Inc. v. District of Columbia Alcoholic Beverage Control Board,* 302 A.2d 222 (D.C.1973); *see also M.B.E., Inc. v. Minority Business Opportunity Commission,* 485 A.2d 152, 159–160 (D.C.1984) (citing cases). In the instant case, Mr. Thomas put on the record his familiarity with the area and his conversation with Hill, thereby placing petitioners on notice that they could introduce evidence or offer argument to refute Thomas' comments. Not only was the on-the-record requirement thus satisfied, but petitioners have failed to demonstrate that the comments led either Mr. Thomas or other Board members to act with prejudice or bias or to prejudge their application. *See Club 99, Inc. v. District of Columbia Alcoholic Beverage Control Board,* 457 A.2d 773, 776 (D.C.1982).[9]

Finally, we note that Mr. Thomas criticized the photographs offered by petitioners because they did not show the loiterers, drug dealers, or prostitutes that he had seen or had been told by Hill hung out around the school.[10] In its six findings of fact, however, the Board never once mentioned loitering, drug dealing, or prostitution in the vicinity of the school as a basis for its decision to deny petitioners' application. Instead, the proximity of the market to the school, the litter problem, and the number of licensees already in the area were the reasons given for the denial. In the absence of any evidence in the record that the conversation related by Mr. Thomas tainted the Board's decision-making process in any way,[11] and in view of the ample

evidence supporting the Board's decision, we find no basis for reversal.

*Affirmed.*

---

**9.** Petitioners' counsel objected to Thomas' remarks as soon as they were made. If counsel believed an improper *ex parte* contact had occurred, the proper remedy would have been to ask for Thomas' recusal. Failure to seek recusal at the administrative level forecloses any claim before this court that Mr. Thomas should have recused himself. *See Rose Lees Hardy Home & School Ass'n v. District of Columbia Board of Zoning Adjustment,* 343 A.2d 564, 567 (D.C.1975) (citing authorities).

**10.** Mrs. Queen, whose photographs did show some of the derelicts in and around the vacant lot, had not yet testified at the time Thomas made his comments.

**11.** In a Supplemental Finding made in response to our remand, the Board stated that "the account of the conversation in the record of this matter had no affect [*sic*] upon the Board's decision."