**TIGER WYK LIMITED, INC., Petitioner**

v.

**DISTRICT OF COLUMBIA ALCO-HOLIC BEVERAGE CONTROL BOARD, Respondent**

No. 01–AA–1173.

District of Columbia Court of Appeals.

Argued Sept. 26, 2002.

Decided May 29, 2003.

Nigel L. Scott for petitioner.

Mary T. Connelly, Assistant Corporation Counsel, with whom Robert R. Rigsby, Corporation Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for respondent.

Before TERRY, REID, and WASHINGTON, Associate Judges.

TERRY, Associate Judge:

Petitioner Tiger Wyk Limited, Inc. ("Tiger"), challenges an order of the Alcoholic Beverage Control Board ("the Board") which denied, on reconsideration, Tiger's transfer application for a Retailer's Class B license.[1] Tiger presents three arguments for reversal. It contends, first, that the Board's decision is not supported by substantial evidence; second, that the Board deviated from its traditional interpretation of the governing regulations when it ruled that granting Tiger's application would result in an overconcentration of licensed establishments; and third, that

---

1. A Retailer's Class B license allows the holder to sell beer and light wine in closed containers for consumption off the premises. *See* D.C.Code § 25–111(a)(6) (1996), recodified as amended in D.C.Code § 25–112(d)(2) (2001); 23 DCMR § 200.6 (1997).

the Board improperly shifted the burden of proof by requiring Tiger to show that real estate values in the neighborhood would not be adversely affected if the application were granted. We hold that there was substantial evidence to support the Board's order and that the Board properly applied the regulations in making its decision. We also hold that the Board did not err in placing the burden of proof on Tiger because a regulation required it to do so. Accordingly, we affirm the Board's order.

I

In 1997 Tiger sought the Board's approval of the transfer of a Class B license to a full-service grocery store ("Tiger Mart") which it planned to open in a small shopping plaza at 300 Riggs Road, N.E.[2] After learning of the application, a group of neighborhood residents filed a protest in opposition.[3] Before the store opened, Tiger agreed to withdraw its application because of the overwhelming negative response from the community. In January 1998, however, Tiger re-filed its application with the Board. Neighbors again objected, claiming that in addition to the likelihood of overconcentration,[4] granting Tiger a license would adversely affect the peace and quiet of the community and would have a detrimental effect on neighborhood property values.

### A. The First Hearing and the First Order

On June 17 and June 24, 1998, the Board held a public hearing on Tiger's application. Willie Blount, an investigator with the Department of Consumer and Regulatory Affairs assigned to the Board, testified that the area surrounding Tiger Mart is primarily residential in nature and that Tiger Mart is in a C–1 zoning district.[5] According to Mr. Blount, there were four other businesses with alcohol licenses in the immediate vicinity, three of which were no more than one block away, "within sight" of Tiger Mart;[6] the fourth, a wholesale distributor (House of Wines, Inc.) which was not open to the public, was two or three blocks away. It was Mr. Blount's "professional opinion" that there was already an overconcentration of licensed retail establishments ("two A's and a B") in the neighborhood.

Several local residents testified against Tiger's application for a license transfer. Their principal contention was that granting a license would result in an overconcentration of licensed establishments in the neighborhood. They also stated that the licensed stores that were already there had trash problems and that the neighbor-

---

**2.** Tiger had purchased the license from another store, Sky Market, which was located on 14th Street, S.E., in another part of the city several miles away.

**3.** *See* D.C.Code § 25–115(c)(4) (1996), recodified as amended in D.C.Code § 25–602(a) (2001).

**4.** One factor which the Board is required to consider, in deciding whether to grant a license, is "whether issuance of the license would create or contribute to an overconcentration of licensed establishments" in the surrounding area. *See* D.C.Code § 25–115(b)(2)(C) (1996), recodified as amended in D.C.Code § 25–314(a)(4) (2001); 23 DCMR § 400.5(c) (1997).

**5.** A C–1 district "is designed to provide convenient retail and personal service establishments for the day-to-day needs of [the immediate neighborhood], with a minimum impact upon surrounding residential development." 11 DCMR § 700.1 (1995).

**6.** Two of the three, Dakota Liquors and Riggs Wine and Liquor, held Retailer's Class A licenses, which allowed them to sell spirits as well as beer and wine. The third, Callas Grocery, held a Class B license.

hood was struggling to deal with loitering and panhandling. One witness, Amanda Lyons, an Advisory Neighborhood Commissioner, testified that loitering and public drinking had been a problem at nearby Dakota Liquors and voiced concern that similar activities would take place in the shopping plaza if Tiger Mart were granted a license. In fact, Ms. Lyons had recently seen individuals loitering and drinking in an area adjacent to Tiger Mart's parking lot, which she reported to the police. Other witnesses testified that public drinking and loitering were already a problem in the shopping plaza and reported seeing men drinking out of containers hidden in brown paper bags. Clayton Butler, another longtime resident and former president of the Lamont–Riggs Citizens Association, said that he had obtained signatures from more than 745 people in the neighborhood who were opposed to Tiger Mart's obtaining a license, primarily because they feared overconcentration. Still another witness, Reverend Grayland Ellis Hagler, commented that the presence of yet another alcohol-licensed business would result in further decline of an already vulnerable neighborhood.

Ronnie Kim, the co-owner of Tiger Mart, acknowledged that his need for a license was based on a desire for increased profits. He did not recall having trouble with loiterers inside or outside his store, but he conceded that on occasion he noticed some in the surrounding area. Mr. Kim could not comment on whether property values in the neighborhood had gone down since he opened his store.

On December 16, 1998, the Board issued an order granting Tiger's transfer application for a Class B license. While the Board acknowledged the presence of four other licensed establishments in the surrounding area, it ruled that granting a license to Tiger would not have an adverse effect on the peace, order, and quiet of the neighborhood. The Board was persuaded, in part, by Tiger's "successful experience in operating a similar full service grocery store ... offering beer and wine" in nearby Prince George's County, Maryland. The Board also found that granting a license to Tiger would not "create or contribute to an overconcentration [of licensed establishments] because of the relatively small amount of floor space" that would be used for the sale of beer and wine, and thus would not have an adverse effect on local property values.

### B. *The Second Hearing and the Final Order*

Community members promptly filed a motion for reconsideration of the Board's decision.[7] The focus of the motion was on an alleged disagreement about the distance between Tiger Mart and the other nearby licensed businesses.[8] The motion also asserted that the Board's conclusions relating to overconcentration were not based on substantial evidence.

On June 23, 1999, and February 9, 2000, the Board held another hearing to consider evidence on the distances between Tiger Mart and the other licensed businesses in the neighborhood and to address the issues raised in the motion about overconcentration. Several months later, the Board issued new Findings of Fact, Conclusions of Law, and a Proposed Order announcing its intention to reverse its ear-

---

7. Motions for reconsideration are expressly authorized by 23 DCMR § 1619.1 (1997).

8. Alcoholic beverage regulations require a distance of at least 400 feet between Retail Class B licensees. *See* 23 DCMR § 301.2 (1997). The movants maintained that the distance between Tiger Mart and the other three licensed establishments was less than 400 feet.

lier decision granting Tiger's application for a Class B license transfer. This new decision was based on a finding that Tiger had not demonstrated that another Class B license was appropriate for the neighborhood. It noted, in addition, that Tiger had failed to provide sufficient credible evidence that granting a license would not have an adverse effect on property values. The Board also found persuasive the Advisory Neighborhood Commission's unanimous opposition to Tiger's application and its belief that granting a license in this case would add to the problems of loitering, panhandling, and public drinking in the area.

Tiger filed exceptions to the Board's order, but on May 30, 2001, the Board issued its final decision denying Tiger's application. The denial was based on the overwhelming problems of overconcentration, community disapproval, and Tiger's failure to show that there would not be a decline in property values if the license were granted. Tiger then moved for reconsideration and a stay of the Board's order, but its motion was denied.

## II

■ Unless the Board has committed an error of law, this court will overturn its decision only if it is unsupported by substantial evidence. *See* D.C.Code § 2–510(a)(3)(E) (2001); *Park v. District of Columbia Alcoholic Beverage Control Board,* 555 A.2d 1029, 1031 (D.C.1989); *Foggy Bottom Ass'n v. District of Columbia Alcoholic Beverage Control Board,* 445 A.2d 643, 645 (D.C.1982). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (citations omitted). Our task, therefore, is "to assess … the logical connec-

tion between the evidence and conclusions, but not to substitute our judgment for that of the administrative agency." *Kopff v. District of Columbia Alcoholic Beverage Control Board,* 381 A.2d 1372, 1387 n. 26 (D.C.1977) (citations omitted).

■ Tiger claims that the Board did not have sufficient evidence, on reconsideration, to deny its transfer application. Our review, however, is not confined just to the evidence before the Board at the second hearing. On the contrary, long-established case law makes clear that we examine the entire administrative record, not just a portion of it, in considering whether an agency decision is supported by substantial evidence. *See, e.g., Williamson v. District of Columbia Board of Dentistry,* 647 A.2d 389, 394 (D.C.1994) ("factual findings must be supported by substantial evidence on the record as a whole"); *4934, Inc. v. District of Columbia Dep't of Employment Services,* 605 A.2d 50, 53 (D.C. 1992) (agency's findings of fact must be affirmed "if they are supported by substantial evidence in the record as a whole"); *Neer v. District of Columbia Police & Firemen's Retirement & Relief Board,* 415 A.2d 523, 526 (D.C.1980) ("the Board's decision [may be overturned] only if its findings are unsupported by substantial evidence in the record as a whole"). In the case before us, therefore, we must examine the record of the first hearing, as well as the second hearing, to determine whether the Board's decision has sufficient evidentiary support.

■ That is not a difficult task, for the record is replete with testimony from several neighborhood residents that the area surrounding Tiger Mart already had enough licensed establishments, and that adding another would result in an overconcentration. There was also evidence that the neighborhood was already struggling with loitering, public drinking, and trash

problems that were attributable, at least in part, to other nearby establishments with retail licenses to sell alcoholic beverages. Because the Board was thus presented with an abundance of testimony from community residents,[9] along with its own investigator's findings, that another license in the neighborhood would not be appropriate, we hold that the Board's decision was amply supported by substantial evidence.[10]

### III

Tiger also contends that since the Board approved the license transfer in 1998, it could not reach a different conclusion on the same facts in 2001. This argument is meritless for at least two reasons. First, as we have said, so long as the Board's final decision is based on substantial evidence, this court will not disturb it. See Park, 555 A.2d at 1031; Foggy Bottom, 445 A.2d at 645. This is true regardless of whether the decision reverses or modifies an earlier Board ruling or announces a new one. Second, and more fundamentally, a regulation directly applicable to this case expressly authorizes any party to file a motion for reconsideration with the Board. See 23 DCMR § 1619.1. Implicit in that authorization is the notion that the Board may indeed reconsider and change any ruling; otherwise the regulation would be pointless. We simply state the obvious by holding that the Board, like any court, has the power to reconsider any decision it makes, unless there is some

statute or regulation that affirmatively forbids such action. Cf. United States v. Green, 134 U.S.App. D.C. 278, 279, 414 F.2d 1174, 1175 (1969) ("The oral ruling of a trial judge is not immutable, and is of course subject to further reflection, reconsideration and change").

Moreover, while not determinative here, the rationale given by the Board in its 1998 decision granting Tiger a license transfer was somewhat dubious. Among the stated reasons for the Board's 1998 ruling was the fact that only a small portion of Tiger's store would be used to sell alcohol. That fact is not mentioned in the statute as a relevant factor; indeed, it strikes us as plainly irrelevant to any consideration of whether a new license "would create or contribute to an overconcentration of licensed establishments, likely to adversely affect the locality, section, or portion in which the establishment is located." D.C.Code § 25–115(b)(2)(C) (1996). The connection between the amount of floor space that an applicant will use to sell alcohol and the Board's decision to grant that applicant a license strikes us as illusory at best, at least on the present record.

### IV

Tiger maintains that the Board failed to provide a reasoned basis for deviating from its past construction of the governing regulations in making its overconcentration finding. Specifically, Tiger argues that the Board's finding was in

9. In addition to the testimony of local residents opposed to the license, the Advisory Neighborhood Commission (ANC) voted unanimously to oppose Tiger's application. The Board was required to give the ANC's recommendation "great weight." D.C.Code § 1–261(d) (1999), recodified as amended in D.C.Code § 1–309.10(d)(3)(A) (2001); see Kopff, 381 A.2d at 1383–1385.

10. While Tiger did present some testimony suggesting that the presence of another licensee would not adversely affect the neighborhood, the Board's decision must be upheld so long as there is substantial evidence to support it, even if the record also contains evidence that would support a contrary result. See, e.g., Upper Georgia Avenue Planning Committee v. Alcoholic Beverage Control Board, 500 A.2d 987, 992 (D.C.1985) (citations omitted).

error because it relied on a 600–foot standard instead of the legally mandated 400–foot requirement in assessing whether there would be an overconcentration of licensees in the neighborhood if the application were granted. Tiger insists that an agency, such as the Board, may not change its interpretation of the controlling regulations without reasoned analysis and justification. *See Brentwood Liquors, Inc. v. District of Columbia Alcoholic Beverage Control Board,* 661 A.2d 652, 656–657 (D.C.1995) (an agency must explain its deviation from traditional interpretation of its governing regulations); *Greater Boston Television Corp. v. FCC,* 143 U.S.App. D.C. 383, 394, 444 F.2d 841, 852 (1970). While Tiger's understanding of the law is correct, its application of that law to the facts of this case is flawed.

The regulations dictate that no Class B license will be issued if the proposed establishment is within 400 feet of another Class B licensee. *See* 23 DCMR § 301.2. If there are no other licensees within that distance, the Board then considers whether the issuance of a new license will nevertheless "create or contribute to an overconcentration of licensed establishments." D.C.Code § 25–115(b)(2)(C) (1996), recodified as D.C.Code § 25–314(a)(4) (2001); 23 DCMR § 400.5(c). Tiger confuses these separate inquiries, and the Board's conclusions, when it asserts that the Board erred

by basing its decision, in part, on the fact that three other licensees were within 600 feet of Tiger's store. Tiger claims that the Board improperly relied on a 600–foot standard as one of the reasons for denying its application when the regulations mandate only a 400–foot radius. The Board's order, however—specifically, paragraph 29 in its Conclusions of Law—makes clear that the overconcentration finding (in which the Board referred to other licensees "located within 600 feet") was made pursuant to D.C.Code § 25–115(b)(2)(C) and the regulations that deal with overconcentration,[11] not the regulation that provides for mandatory denial because the proposed site is within 400 feet of another licensee; that regulation, 23 DCMR § 301.2,[12] is not even mentioned. Thus, while the Board found as a fact that the other three licensed retail establishments in the area were more than 400 feet from Tiger's store,[13] it nevertheless could lawfully determine, as it did, that to license another store when all three of those establishments were within 600 feet would result in a harmful overconcentration.

■ Tiger also contends that the Board used the term "block" to define the area around Tiger Mart in making its overconcentration finding, but never clearly defined what the term included, or how it was measured.[14] Citing the Board's fail-

---

**11.** 23 DCMR § 400.5(c) instructs the Board to consider whether a new establishment will contribute to an overconcentration in the neighborhood before approving the license, and 23 DCMR § 400.7(b) requires the applicant to present to the Board "such evidence ... as would lead a reasonable person to conclude [that granting the license] will not contribute to a proliferation of ABC licenses ... which would be detrimental in light of such elements as noise, disorderly conduct, criminal activity, [and] poor sanitation ...."

**12.** 23 DCMR § 301.2 states: "No Retailer's License Class B shall be issued for, nor trans-

ferred to, any premises which are located four hundred feet (400 ft.) or less from another Retailer's License Class B."

**13.** Both Dakota Liquors and Riggs Wine and Liquor were found to be "approximately 150 yards" (450 feet) from Tiger Mart, and Callas Grocery was "within 600 feet." Findings of Fact, paragraph 4.

**14.** The Board's final order stated in its Conclusions of Law, paragraph 29:

Pursuant to D.C.Code § 25–115(b)(2)(C) and 23 DCMR §§ 400.5(c) and 400.7(b), the Board is required to determine whether is-

ure to define a "block," Tiger asserts that the Board again deviated from the traditional interpretation of the regulations. *See Brentwood Liquors,* 661 A.2d at 656–657; *Greater Boston Television Corp.,* 143 U.S.App. D.C. at 394, 444 F.2d at 852. This assertion is also without merit. Regardless of how the term "block" may have been used, the Board has the statutory authority, when evaluating an application, to consider whatever surrounding area may be necessary to decide whether granting another license is appropriate. *See* D.C.Code § 25–115(b)(3)(A) (1996).[15] Whether a block is construed as something small, large, or inbetween, the Board's statutory authority allowed it to establish whatever perimeter it deemed necessary when considering whether the grant of another license in the neighborhood would result in a harmful overconcentration.

**V**

 Finally, Tiger argues that the Board erred in placing the burden on it to prove that the issuance of a license would not have a negative effect on the property values in the area. We find no error because the regulations explicitly require an applicant to "present to the Board such evidence ... as would lead a reasonable person to conclude [that the proposed establishment] will not cause real property values to go down in the locality, section, or portion of the District of Columbia where it is to be located." 23 DCMR § 400.3(a); *see also* D.C.Code § 25–115(b)(1)(A) (1996) (requiring the Board to consider the "effect of the [new] establishment on real property values" when determining whether another licensed establishment is appropriate[16]). Since Tiger offered no evidence whatever on this point, except for testimony from Mr. Kim that he did not know whether property values had gone down, the Board could reasonably conclude in its order that Tiger had "failed to provide sufficient credible evidence ... that the granting of [a] license to the establishment would not have an adverse affect on real property values." Under the regulations, Tiger had the burden of showing that another licensed establishment would be appropri-

---

suing the license would create or contribute to an overconcentration within the one square block at issue. In this instance, two Class "A" establishments and one Class "B" establishment are already located within 600 feet of the Applicant's establishment within the same block .... The Board finds that to add a fourth ... would result in an overconcentration of Class "A" and Class "B" off-premises Retailer's licenses within the block.

15. This statute provides that the Board "shall identify the boundaries of the locality, section, or portion of the District of Columbia to apply in determining the appropriateness of each application [and] ... shall determine, on a case-by-case basis, the size of the area relevant for the appropriateness review." D.C.Code § 25–115(b)(3)(A) (1996). The same subsection also provides that "a locality shall be the immediate neighborhood of the establishment, a section shall be an area larg-

er than the immediate neighborhood, and a portion shall be an area larger than a section."

In May 2001 this statute was amended and recodified. The substance of it can now be found in D.C.Code § 25–312(a) (2001), except that "locality," "section," and "portion" are now defined in D.C.Code § 25–101 (2001) as those neighborhoods within a radius of 600 feet, 1200 feet, and 1800 feet of an establishment, respectively. Our affirmance of the Board's decision in this case is thus without prejudice to Tiger's right, if any, under the 2001 Code to submit a proposal for the measurements in determining appropriateness. *See* D.C.Code § 25–312(e) (2001). Under either version of the Code, however, the Board retains the final authority to determine what surrounding area is relevant for making its appropriateness determination.

16. In the recent recodification, this language appears in D.C.Code § 25–313(b)(1) (2001).

ate, and it failed to carry that burden. *See, e.g., Haight v. District of Columbia Alcoholic Beverage Control Board,* 439 A.2d 487, 493 (D.C.1981) (burden of showing that license requirements have been met lies with the applicant).

## VI

For the foregoing reasons, the Board's denial of Tiger's transfer application for a Class B license is

*Affirmed.*