PANUTAT, LLC, Petitioner,

v.

DISTRICT OF COLUMBIA ALCO-HOLIC BEVERAGE CONTROL BOARD, Respondent,

and

Chris Labas, Florence Harmon, Michael MacChiaroli, Julie Gess, Andrew Dinsmore, and Trevor Neve, Intervenors.

No. 12–AA–532.

District of Columbia Court of Appeals.

Submitted May 14, 2013.

Decided Sept. 19, 2013.

Irvin B. Nathan, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, Donna M. Murasky, Deputy Solicitor General, and Richard S. Love, Senior Assistant Attorney General, filed a statement in lieu of brief in support of respondent.

Cornish F. Hitchcock, Washington, DC, was on the brief for intervenors.

Matthew August LeFande was on the brief for petitioner.

Before THOMPSON and McLEESE, Associate Judges, and BELSON, Senior Judge.

THOMPSON, Associate Judge:

This petition for review relates to an application by Petitioner Panutat, LLC ("Petitioner" or "Panutat") for a Retailer's Class CN alcoholic beverage license for a nightclub (Sanctuary 21, hereafter "Sanctuary") Panutat proposed to operate in the basement of 2131 K Street, N.W. (the "Sanctuary license"). A related petition for review was before this court previously, after the Alcoholic Beverage Control Board (the "Board") had initially approved the Sanctuary license in an August 4, 2010, order and Intervenors Chris Labas et al. petitioned for review of that order. We resolved that earlier petition by granting the Board's Consent Motion to Remand, in which the Board requested that we remand the matter to enable it to "reconsider evidence" pertaining to the operations of Shadow Room, a nightclub already holding a CN license for its operation at 2131 K Street, N.W., and to reconsider its order granting the Sanctuary license.[1] Subsequently, after a September

---

1. Panutat's proposal was for Sanctuary to take over part of the space currently occupied by Shadow Room (the basement of 2131 K St.), with Shadow Room continuing operations on the first floor of that building.

The Board found that the entities trading as Sanctuary and Shadow Room are owned by the same individuals, Swaptak Das, Stephen Acott, and Panutat Khunachak. Intervenors argued to the Board that the Sanctu-

28, 2011, hearing (the "remand hearing"), the Board issued a January 11, 2012, order (the "Order") in which it reversed its August 4, 2010, order and denied the Sanctuary application. The Order stated that "[b]ased on the neighborhood's experience with Shadow Room, ... increasing the number of patrons at 2131 K Street, N.W., w[ould] adversely impact peace, order, and quiet and vehicular and pedestrian safety in the neighborhood." Order at 12. In a March 28, 2012, order (the "Reconsideration Order"), the Board also denied Panutat's request for reconsideration. Panutat now challenges the Board's rulings, on several grounds.[2] For the reasons that follow, we affirm.

## I. Standard of Review

 " 'Under the general limited review that we undertake of any agency decision, we must affirm unless we conclude that the agency's ruling was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " *Recio v. District of Columbia Alcoholic Beverage Control Bd.*, 75 A.3d 134, 140–41, 2013 WL 4779719, at *5 (D.C.2013). " '[W]here questions of law are concerned, we review the agency's rulings *de novo*

because we are presumed to have the greater expertise when the agency's decision rests on a question of law, and we therefore remain the final authority on issues of statutory construction.' " *Id.* Nevertheless, " 'an agency's interpretation of its own regulations or of the statute which it administers is generally entitled to great deference from this court.' " *Id.*

██ "Unless the Board has committed an error of law, this court will overturn its decision only if it is unsupported by substantial evidence." *Tiger Wyk, Ltd. v. District of Columbia Alcoholic Beverage Control Bd.*, 825 A.2d 303, 307 (D.C.2003). "When there is substantial evidence in the record to support the Board's decision, we will not substitute our judgment for that of the Board, 'even though there may also be substantial evidence to support a contrary decision....' " *Aziken v. District of Columbia Alcoholic Beverage Control Bd.*, 29 A.3d 965, 972 (D.C.2011). Further, "[s]o long as the Board's final decision is based on substantial evidence, this court will not disturb it[,] ... regardless of whether the decision reverses or modifies an earlier Board ruling or announces a new one." *Tiger Wyk*, 825 A.2d at 308.[3]

---

ary application was an attempt to circumvent the voluntary agreement between Advisory Neighborhood Commission ("ANC") 2A and Shadow Room, which limited Shadow Room to 300 patrons. They make the same argument before us, calling the Sanctuary application a "clear end-run" around the voluntary agreement. The Board found that the voluntary agreement "only applies to Shadow Room" and "has no relevance to the present matter." Order at 2. Given our disposition of the petition, we need not address the issue.

2. Through a D.C.App. R. 28(k) letter, petitioner has raised in addition a challenge to the standing of the Intervenors and urges us to apply our holding in *Padou v. District of Columbia Alcoholic Beverage Control Board*, 70 A.3d 208 (D.C.) However, *Padou* is inapposite. *Padou* was unable to establish that he

suffered an "injury in fact" because he could not show how the renewal of a liquor license for a nude dancing club would "disrupt the peace, order, and quiet of his home," which was "located well over a mile away from the club." *Id.* at 212. In the instant case, the record shows that some if not all of the Intervenors live on the same block as, or around the corner from, the proposed establishment.

3. *Cf. Carter v. District of Columbia*, 980 A.2d 1217, 1222 (D.C.2009) (rejecting argument that second trial judge's summary judgment ruling violated the "law of the case" in that it reconsidered the first trial judge's ruling, explaining that "absent a showing of procedural unfairness causing prejudice, 'the proper inquiry is whether the second trial judge's ultimate disposition was correct, and not whether that ruling was consistent with the first

## II. Analysis

### A.

We begin by addressing Panutat's argument that the Board was without authority to "reverse an issue already decided and not preserved for appeal." We note first that we do not agree with Panutat's "not preserved for appeal" premise. As the Board correctly stated in its Reconsideration Order, in their brief filed with this court before we granted the motion to remand, the Intervenors argued that the Board had "err[ed] as a matter of law" by "categorically refus[ing] to hear any evidence about operations of Shadow Room" during the original protest hearing held on April 28, 2010 (the "protest hearing").[4] Indeed, as the Board explained in its Reconsideration Order, it was in light of that argument that the Board "agreed to remand the case 'to reconsider evidence of Shadow Room's operation....'"[5]

Second, we reject Panutat's argument that the Board was without authority to "reverse an issue already decided." The Board's initial ruling that information about Shadow Room was irrelevant, see note 4 *supra,* and its initial order granting the Sanctuary application were not irrevocable (and Panutat could not reasonably have relied on their being so), because the Intervenors timely petitioned for review by this court.[6] Further, as we recognized

---

trial judge's holding'"). Here, we perceive no procedural unfairness in upholding the Board's order that reversed its original ruling. Although Panutat chose not to present rebuttal evidence at the remand hearing, it had the opportunity to do so, as well as the opportunity to make a post-remand-hearing written submission regarding whether the evidence presented by Intervenors at that hearing was relevant. Thus, we cannot agree with Panutat that it was "deprived ... of the opportunity to further litigate ... before the Board" the matters addressed in the Order.

**4.** The record shows that during the protest hearing, the Board actually did allow testimony about a number of problems that neighbors attributed to Shadow Room patrons (and the Board discussed that testimony in its August 4, 2010, order). However, sustaining Panutat's objections, the Board refused to admit constituent emails written to ANC 2A Commissioner Florence Harmon regarding "noise from Shadow [Room]," excluded evidence of police reports related to Shadow Room, curtailed testimony about valet parking for Shadow Room patrons, and declined to admit a photograph and testimony about traffic blockages during incidents at Shadow Room. Although Intervenors' counsel argued that such evidence was "clearly relevant," the Board's Interim Chair ruled that "what happens with the Shadow Room ... is irrelevant." And, in its August 4, 2010, order, the Board ruled that it was inappropriate for it to consider the contribution of Shadow Room patrons to litter, crime, and noise in the community when they "lack a nexus to the establishment."

**5.** It is correct that, in their petition for review, Intervenors raised as the pertinent "Question Presented" the issue whether the Board was obligated to hear evidence about Shadow Room's operations for the reason that such evidence bore on whether applicant Sanctuary's principals, directors, and shareholders (who were also Shadow Room's principals, directors, and shareholders) were "fit to hold an ABC license[.]" However, Intervenors' brief also argued that "Shadow Room [had] caused numerous problems for nearby residents in the form of crime, noise, litter and other undesirable activities." And, in any event, we discern no reason why, in pursuing during the remand hearing their claim that the Board must consider Shadow Room's operations, Intervenors should have been limited to the precise arguments they had earlier advanced, especially since this court's remand order imposed no such restriction. *Cf. Yee v. City of Escondido,* 503 U.S. 519, 535, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992) (holding that parties on appeal are not limited to the precise arguments they made previously).

**6.** *Cf. District of Columbia Bd. of Elections & Ethics v. Jones,* 495 A.2d 752, 753–54 (D.C. 1985) ("It is well settled that ... when a judgment is entered in a trial court and a notice of appeal subsequently filed, the judgment does not become final until the appellate court issues its mandate.").

in *Tiger Wyk,* "like any court, [the Board] has the power to reconsider any decision it makes, unless there is some statute or regulation that affirmatively forbids such action." 825 A.2d at 308. Panutat has not identified any such statute or regulation, and we are not aware of any that precluded the Board from reversing its ruling. Upon reconsideration, the Board may "change any ruling." *Id.*

While the Intervenors might have sought reconsideration by the Board pursuant to 23 DCMR § 1719.1 before seeking review by this court, the Board's regulations did not require them to take that intermediate step to obtain Board reconsideration. Quite the contrary, our case law reveals that, on a number of occasions, the Board has elected to reconsider a licensing decision after agreeing with a petitioner's assignment of error argued in a brief filed in this court, and this court has ordered a remand to the Board to permit it to reconsider its decision.[7] Panutat has identified no reason why that procedural course should not have been available here, where (as explained in the Reconsideration Order), the Board determined, in

light of the Intervenors' arguments to this court, that it had "wrongly agreed . . . that . . . evidence related to Shadow Room was irrelevant" to its consideration of the Sanctuary application and had therefore failed to consider "all relevant evidence of record."[8]

**B.**

In its next set of claims, Panutat asserts that the Board (1) improperly premised its denial of the Sanctuary application on "allegations of prior violations of another company [Shadow Room]" (2) without "evidence that the proposed establishment was responsible for, or would aggravate, existing noise conditions," and (3) on the basis of "speculation as to the future effect of the proposed establishment upon peace, order and quiet of the area." Panutat contends that the Board's initial ruling, in its August 4, 2010, order, was the legally correct one: that because Sanctuary had not yet opened, and therefore because none of the Shadow Room-related incidents about which the Intervenors presented evidence had a nexus to or could be attributed to Sanctuary, the incidents were

7. *See, e.g., Heyert v. District of Columbia Alcoholic Beverage Control Bd.,* 399 A.2d 1309, 1310 (D.C.1979) (recounting that this court remanded the record where the Board had granted a liquor license for an establishment located near a church on the basis that the church was on "ground zoned commercial," but, after protestants petitioned for review by this court and in light of an opinion by the Corporation Counsel, had decided that the location was not "ground zoned commercial" and requested a remand "so that it might vacate its holding . . . and conduct further proceedings"); *Jameson's Liquors, Inc. v. District of Columbia Alcoholic Beverage Control Bd.,* 384 A.2d 412, 415 (D.C.1978) (explaining that after the Board had initially rejected a request for reconsideration on the ground that it was defective as to form and the petitioner sought review in this court, the Board filed a motion to remand so that it could permit the filing of the request for reconsider-

ation, and this court granted the motion); *Northeast Liquors, Inc. v. District of Columbia Alcoholic Beverage Control Bd.,* 302 A.2d 222, 223–24, 225 (D.C.1973) (noting that where the Board had issued its decision in reliance on evidence obtained after a hearing, it requested a remand to remedy that procedural defect and this court ordered a remand); *see also Georgetown Univ. Hosp. v. Dep't of Emp't Servs.,* 659 A.2d 832, 838 n. 7 (D.C.1995) (suggesting that the agency might consider, as a vehicle for reconsidering decisions when appropriate, the procedure followed in the court system, where "initiative for a remand of a case pending appeal commonly comes from an indication by a trial judge that the remand will be useful in resolving the litigation" (citing *Smith v. Pollin,* 194 F.2d 349, 350 (D.C.Cir.1952))).

8. D.C.Code § 25–313(b) (2001).

not a proper basis for denying the Sanctuary application. We disagree.[9]

The governing statute provides that, in determining whether to grant an application for a liquor license, the Board must determine whether the applicant's establishment is "appropriate for the locality, section, or portion of the District where it is to be located," a determination it is to make by considering "all relevant evidence of record, including ... [t]he "effect of the establishment on peace, order, and quiet, including the noise and litter provisions set forth in §§ 25–725 and 25–726," and "[t]he effect of the establishment upon residential parking needs and vehicular and pedestrian safety[.]" D.C.Code § 25–313(b)(2)–(3). In the Order in issue here, the Board reasoned that evidence about Shadow Room's operations was relevant to these matters for two reasons: First, the Board reasoned that notwithstanding the fact that Shadow Room is a separate corporation (Acott Ventures, Inc., t/a Shadow Room), Shadow Room's and Sanctuary's overlapping ownership and their "shar[ing] of] similar management" were relevant to whether the " 'new' owner will operate the establishment without a detrimental impact on the neighborhood."[10] Second, the Board reasoned that since Panutat proposed to operate Sanctuary at the same address where Shadow Room operates, evidence of Shadow Room's operations is relevant to whether "yet another establishment at the same location will exacerbate existing issues." Far from rendering the Board's Order arbitrary or capricious, both rationales seem to us eminently reasonable (and, by contrast, the Board's previous decision to exclude as irrelevant some evidence about Shadow Room's operations seems, at the very least, "somewhat dubious." *Tiger Wyk*, 825 A.2d at 308).

Nor, contrary to Panutat's argument, was the Order contrary to law for the reason that the record was devoid of "evidence that the proposed establishment was responsible for" the adverse effects on peace, order, and quiet described by the Intervenors' witnesses. As already noted, the Board must be satisfied that "the establishment is appropriate for the locality, section, or portion of the District where it *is to be located* [,]" D.C.Code § 25–313(a) (italics added), a determination it must make by considering "the effect of the establishment on peace, order, and quiet"

---

**9.** We note that at the outset of the remand hearing, the Board's Interim Chair told the parties that the Board would take evidence it had previously excluded about "the other operation" and about "how the operation of th[at] existing establishment ... impact[s]" peace, order, and quiet and "the application of Sanctuary." Citing that portion of the remand hearing transcript and the discussion that followed, the Board stated in its Reconsideration Order that "neither party objected to ... the issues the Board stated it would address at the Remand Hearing." That characterization is not entirely accurate. Panutat's counsel did comment that evidence "disregarded in the original order, is certainly available for the Board's consideration now," but he at least arguably qualified that statement by saying that he wanted to afford the Intervenors an opportunity to offer "whatever additional testimony or evidence that they may wish to present in support of [the] proposition" that the Board should disregard the corporate forms of Shadow Room and Sanctuary and treat them as a single entity. We note in addition that at the protest hearing, Panutat maintained a continuing objection to evidence about incidents involving Shadow Room, and that Panutat was not a party to the Consent Order to Remand. We therefore decline to hold that Panutat waived the issue of whether the Board could lawfully consider evidence relating to the operation of Shadow Room, and we proceed to the merits of Panutat's argument.

**10.** As the Board reasonably observed in its Reconsideration Order, "how [the] owners operate Shadow Room is indicative of how they would operate Sanctuary 21."

and "upon residential parking needs and vehicular and pedestrian safety." *Id.*, § 25–313(b)(2)–(3). Thus, under the plain terms of the statute, the Board is not excused from considering "the effect of the establishment" in cases where the applicant seeks a liquor license for a not-yet-located establishment that is without a track record (i.e., that cannot possibly have had any effect on the statutory factors by the time its application is under consideration). Further, our legislature has declared that "[r]egardless of the appropriateness ... of a particular establishment, standing on its own, if it creates or contributes to an overconcentration," i.e., to a "detrimental proliferation of ABC [i.e., Alcoholic Beverage Control] licensees in the area," "this is grounds for denial of the license as inappropriate." D.C. Council Comm. on Consumer and Regulatory Affairs, Comm. Report on Bill 6–504, "District of Columbia Alcoholic Beverage Control Act Reform Amendment Act of 1986," at 40 (Nov. 12, 1986) (hereafter, "Committee Report"). For that reason, in its review, "the Board must consider ... the ... nature of operations of those licensees in the same class as that sought by the applicant." *Id.*

In addition, the Board's practice (prior to its now-stricken August 4, 2010, order) has been to consider the adverse effects on the neighborhood attributable to the operation and patrons of existing licensees in the area where the license applicant proposes to operate its establishment. *See, e.g., Park v. District of Columbia Alcoholic Beverage Control Bd.*, 555 A.2d 1029, 1031 (D.C.1989) (upholding Board's denial of license application as supported by substantial evidence over applicant's argument that while the denial was premised on a

finding that a nearby school playground was "littered with broken glass, beer bottles, [and] beer cans," the "beer bottles and cans obviously could not have come from [the applicant's] store because they were not licensed to sell beer"); *Muir v. District of Columbia Alcoholic Beverage Control Bd.*, 450 A.2d 412, 413 (D.C.1982) (applying the statute's previous "appropriateness" provision, D.C.Code § 25–115 (1981),[11] and holding that the Board's denial of a liquor license application was supported by substantial evidence, explaining that "[t]here are in operation in the area at the present time a number of retailers with liquor licenses[,]" that "[t]estimony at the hearing revealed the deleterious effect [including litter and loiterers] that such business had produced in the neighborhood[,]" and that this and other evidence were "sufficient to support findings that the grant of another license in the area will only contribute to the existing problems"). We therefore owe deference to the Board's interpretation that the statute requires it to consider the nature and detrimental effects of Shadow Room's operations at the same location in which Panutat proposed to operate Sanctuary, and to consider whether granting a liquor license to Sanctuary would exacerbate those adverse effects. *Cf. D.C. Library Renaissance Project/West End Library Advisory Grp. v. District of Columbia Zoning Comm'n*, 73 A.3d 107, 120–21 (D.C.2013) (deference is owed to longstanding agency construction of statute).

■ We also are satisfied that the evidence adduced at the hearings enabled the Board to determine without speculation that approval of the Sanctuary license would "aggravate[ ] existing noise condi-

---

11. D.C.Code § 25–313 represents "an elaboration of the requirement of [prior] law (D.C.Code § 25–115(a)(6) [1981]) that the

Board, before issuing a license, must be satisfied that the location 'is an appropriate one....'" Committee Report at 37.

tions"[12] and have an adverse effect on peace, order, and quiet in the area. As the Board recognized, unless Shadow Room were to "limit its occupancy to 50 people," approval of Sanctuary's application—which would have enabled it to accommodate 250 nightclub patrons on the same nights when Shadow Room would be operating with its approved 300–patron capacity—was calculated to "add more nightclub patrons to the neighborhood" around 2131 K Street. It was hardly speculative for the Board to conclude that more patrons would be likely to bring more noise to the neighborhood.

Similarly, substantial evidence supports the Board's conclusion that approval of the Sanctuary application would have an adverse impact on peace and order. In its factual findings, the Board cited testimony by Metropolitan Police Department Sergeant Vernon Grundger about calls for police to respond to incidents at 2131 K Street. Sergeant Grundger testified about responding to "well over 20" assaults and incidents at the location, a number he observed was "basically the same" as at other ABC establishments, all of which have a "lot of incidents." That testimony and the police-incident reports admitted at the remand hearing enabled the Board to conclude that approving a liquor license for Sanctuary, enabling it to operate as an "ABC establishment" nightclub, could be expected to add about the same number of incidents to the neighborhood around 2131 K Street (i.e., "a sharp increase in patron-related disturbances").

In addition, Intervenor Labas testified about the increase he had observed "in the amount of defecation and litter" in the area attributable to Shadow Room patrons and about seeing individuals urinating, vomiting, defecating, and littering in the alley behind his building. Commissioner Harmon also testified about constituents' complaints about littering, public urination, and public sexual activity associated with nightclub patrons, and the Board admitted emails relating to those complaints.

The foregoing testimony supported the Board's findings that Shadow Room nightclub's patrons "regularly disturb nearby residents by yelling, fighting, playing music, and revving their car engines," and "defecate, litter, and urinate, around and on [nearby residential property]." The Board's conclusion that approving the Sanctuary application would "creat[e] more peace, order, and quiet problems than the neighborhood can handle" was not speculative, but was "derived rationally from [those] findings." *Foggy Bottom Ass'n v. District of Columbia Alcoholic Beverage Control Bd.*, 445 A.2d 643, 645 (D.C.1982).

#### C.

█ Panutat emphasizes that the neighborhood around 2131 K Street is zoned for heavy commercial use and argues that the

---

**12.** The Board heard testimony by ANC 2A Commissioner Harmon (who resides in a building close to 2131 K Street) about the many complaints she had received from her constituents about yelling and other noise that "coincided with the closing [time] of the Shadow Room" and that disturbed her own sleep "at least once a week." In addition, the Board heard testimony by Intervenor Labas, a tenant and property manager at a condominium building located on 22nd Street, N.W. (in the same block as 2131 K Street), about hearing Shadow Room patrons talking loud, playing music, and revving up their car engines in the wee hours of the morning.

Panutat highlights that the reference in § 25–313(b)(2) to "including the noise ... provisions set forth in ... § 25–725" is a reference to a D.C. Code section that does not apply to noises produced by the human voice. However, in mandating consideration of the effect on peace, order, and quiet, § 25–313(b)(2) does not limit the Board's consideration to the types of noises described in § 25–725.

Board's order "negate[d]" the high density nature of the commercial zoning district, interferes with the "ordinary commercial use of a commercially zoned building," and amounted to an "effort[ ] to inflict a purely 'residential character' upon a high density commercial district," in contravention of "the letter and intent of District of Columbia zoning law." We are not persuaded by this argument.

Panutat is correct that the zoning regulations are concerned with matters such as lessening congestion in the street, preventing undue concentration, and creating conditions favorable to safety and to the general welfare. *See* D.C.Code § 6–641.02 (2001). Again, however, District of Columbia law directs that the Board, too, is to consider matters including residential parking needs, vehicular and pedestrian safety, and "peace, order, and quiet." [13] D.C.Code § 25–313(b)(2). Moreover, D.C.Code § 25–314(c) provides that "[i]n the case of applications for nightclub or tavern licenses, the Board shall consider whether the proximity of the establishment to a residence district, as identified in the zoning regulations of the District and shown in the official atlases of the Zoning Commission for the District, would generate a substantial adverse impact on the residents of the District." Section 25–314(c) reflects a recognition by the Council of the District of Columbia that "a nightclub, by its very nature, may be inappropriate for the [commercial] area where it is to be located when other [commercial] establishments would not be inappropriate." Committee Report at 41. In light of the foregoing provisions and the legislative intent to give priority to nearby residence-district concerns over nightclub uses in

areas zoned for commercial use, we cannot accept Panutat's argument that the Board's Order, which relied on the Intervenors' complaints about the problems Shadow Room patrons cause for the residential neighborhood near 2131 K Street, contravened District of Columbia zoning law.

As Panutat acknowledges, 2131 K Street abuts an R–5–E residential zone (in which, we note, only "medium-high density shall be permitted," 11 DCMR § 350.2). We agree with Intervenors that the Board was "on solid ground" when it took into consideration that Sanctuary "would be surrounded by condominiums, townhouses, and residences and would share a block with a residential zone."

### D.

Panutat contends in addition that the Order constitutes a *de facto* moratorium on the issuance of new liquor licenses. We do not agree. While the Board is authorized to impose a moratorium through rulemaking, *see* D.C.Code § 25–351 (2001), it is also authorized to deny a new application where (and it is required to consider whether) granting a new license "would create or contribute to an overconcentration of licensed establishments which is likely to affect adversely the locality, section, or portion in which the establishment is located." D.C.Code § 25–314(a)(4). Although the Board did not refer to it explicitly, § 25–314(a)(4) provided a statutory basis for the Board to deny the Sanctuary application on the ground that the neighborhood around 2131 K Street "does not have the capacity to deal with additional nightclub patrons." Consideration of the factors described in § 25–

---

13. Of course, the Board may do so only in determining whether to grant a liquor license; thus, in this case, the Board's Order would not prevent Panutat from operating a 250-patron club or other business at 2131 K Street, if it sought to do so without serving alcohol. Thus, the Order does nothing to negate what the zoning regulations permit as the density and commercial nature of the area in which 2131 K Street is located.

314(a)(4) appears to be implicit in the Board's ruling.

Further, as the Board explained in its Reconsideration Order, denial of the Sanctuary application did not effect a moratorium because the order "does not prohibit the Board from issuing another liquor license at 2131 K Street, N.W." As the Board reasoned, future applicants, if faced with a protest, might be able effectively to argue that "the neighborhood has changed in some significant way," thus enabling the neighborhood to handle additional nightclub patrons. Conceivably, too, a future applicant might show that it has an effective way to address, minimize, or avoid problems such as those in evidence in this case.[14] Another possibility is that Shadow Room might limit its occupancy in a way that would affect the Board's assessment of the neighborhood's capacity to handle an additional licensee. For all these reasons, we agree with the Board's conclusion that its order did not impose a moratorium within the meaning of the statute.

### E.

■■■ Finally, Panutat argues that "[i]f the Board found that Shadow Room was appropriate for this commercial district, it also must have found that the nearly identical operation proposed by [p]etitioner . . . was also appropriate." We reject this argument as well. We note first that the Shadow Room application the Board granted on the same day it denied the Sanctuary application was a license *renewal*, while the Sanctuary application was a new application. As required by D.C.Code § 25–314(a)(4), for new license applications—but not for renewal applications—the Board must consider "[w]hether issuance of the license would create or contribute to an overconcentration of licensed establishments which is likely to affect adversely the locality . . . in which the establishment is located." That separate consideration alone provided the potential basis for a renewal in Shadow Room's case, but a contemporaneous license denial in Sanctuary's case.

That potential was realized because the Board further found that "an appropriate capacity" for Shadow Room, the existing licensee, was 300 patrons on the first-floor and basement levels of 2131 K Street and "saw no reason to . . . authorize an additional 250 patrons" at the same location by granting a license to Sanctuary to operate in the basement level (with Shadow Room withdrawing from the basement level and accommodating up to 300 patrons on the first-floor level). As the Board explained in its Reconsideration Order and the Shadow Room order, it determined that Shadow Room was "having a negative impact on the community" but that "some nightclub activity is appropriate for the neighborhood[ ] because the establishment is located in a commercial zone" and therefore that the negative impact "did not justify revocation of Shadow Room's . . . license." Instead, it determined, some additional conditions on Shadow Room (e.g., its no longer distributing flyers) were warranted.

We take Panutat's point that some of the language in the Board's order approving a renewal of Shadow Room's license is difficult to square with the Board's language in the Order and Reconsideration Order. Contrast the Board's statement in its order approving renewal of the Shadow Room license ("[W]e did not find that Shadow Room, in and of itself, is adversely impacting the neighborhood.") with its

---

14. *Cf. Gerber v. District of Columbia Alcoholic Beverage Control Bd.,* 499 A.2d 1193, 1195 (D.C.1985) (concluding that the Board did not abuse its discretion or act arbitrarily by granting license to applicant, even though previous applicant was denied license for same location two years earlier, when it individually evaluated each applicant).

statement in the Reconsideration Order that it "recognized that Shadow Room was having a negative impact on the community." Reconsideration Order at 3. Nevertheless, we perceive no reason to disturb what a reading of the full text of the orders shows to be the Board's consistent rationale that it was the *combination* of Sanctuary's proposed occupancy of 250 patrons with Shadow Room's occupancy of 300 patrons that was, in the Board's view, "too much for the neighborhood to handle."

During hearings on the Sanctuary application, the Board heard testimony that Shadow Room's valets double park cars, "have the street backed up and you can't get emergency vehicles down K Street," and park cars in the alley, impeding other vehicles from passing. While acknowledging that "Shadow Room has moved its valet service away from the premises" toward 21st Street "in order to mitigate the effect of large groups of patrons leaving the establishment at the same time," the Board found in its Order that Shadow Room's "valet service continually parks vehicles in a manner that interferes with emergency vehicles" and cited its fear that approval of the Sanctuary application would "cause increased traffic in the area surrounding the establishment, ... severely delay[ing] emergency vehicles; thus, potentially creating a life-threatening situation for vehicles and pedestrians (as well as people in need of rescue) on a recurring basis." By contrast, in its order of the same date approving Shadow Room's renewal license, the Board stated that "a number of positive developments related to traffic and parking have occurred" and that "complaints of illegal parking in the service lane no longer occur on a frequent basis." The discrepancy is explained in part by the fact that, in the instant case, the Board limited the evidence to incidents that had occurred as of the date of the

protest hearing (which took place in April 2010), while in the Shadow Room license renewal matter, the Board heard evidence as of the date of the June and July 2011 hearings on Shadow Room's application. The parties' briefs do not discuss whether it would have been proper for the Board to take notice of evidence presented in the Shadow Room case in considering the traffic effects of Sanctuary. We need not resolve that issue, because we are satisfied that the "positive developments" the Board cited in the Shadow Room order did not require the Board, in acting on the Sanctuary application, to find that the problem of parked cars impeding the alley and service road would no longer be an issue with an influx of up to 250 additional nightclub patrons.

## III.

For the foregoing reasons, the Board's order denying the Sanctuary application is

*Affirmed.*

