Richard HOLZSAGER,
et al., Petitioners,

v.

DISTRICT OF COLUMBIA ALCOHOLIC BEVERAGE CONTROL
BOARD, Respondent.

Safeway, Inc., Intervenor.

No. 07–AA–1239.

District of Columbia Court of Appeals.

Argued April 7, 2009.

Decided Aug. 27, 2009.

---

Richard Holzsager, pro se.

Richard S. Love, Senior Assistant Attorney General, with whom Peter J. Nickles, Acting Attorney General for the District of Columbia at the time the brief was filed, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, were on the brief, for respondent.

Jerry A. Moore III, with whom Meredith L. Boylan, Washington, DC, was on the brief, for intervenor.

Before WASHINGTON, Chief Judge, KRAMER and THOMPSON, Associate Judges.

THOMPSON, Associate Judge:

By a *pro se* Petition for Review filed on November 16, 2007, Richard Holzsager, Sarah Green, Ruth Foster, and Ophelia Cowan sought review of an order of the District of Columbia Alcoholic Beverage Control Board ("the Board") granting a license to Safeway, Inc. ("Safeway") to sell beer and wine at its grocery store branch located at 6500 Piney Branch Road, N.W. ("the Piney Branch Road store").[1] We

---

1. Although Mr. Holzsager, Ms. Green, Ms. Foster and Ms. Cowan all signed the Petition for Review, only Mr. Holzsager's signature appears on the Brief for Petitioner and only the names of Mr. Holzsager, Ms. Green and Ms. Foster are listed in the opening brief as petitioners. Intervenor Safeway notes in its brief that Mr. Holzsager is not an attorney and may not represent anyone other than himself in this proceeding. Because the ques-

uphold the Board's decision to grant the license.

## I.

The parties agree on the sequence of events leading to this appeal. On May 12, 2003, Safeway applied to the Board for a Class B retailer's license for the Piney Branch Road store. At the time, District of Columbia law provided two routes by which members of the community could formally oppose an application seeking a new liquor license: (1) by lodging a protest with the Board (see D.C.Code § 25–601 (2001), amended by D.C. Law 16–191, § 47(a) (2007)); and (2) by petitioning the Board to authorize the initiation of a referendum process (see D.C.Code §§ 25–603–608 (2001), repealed by Omnibus Alcoholic Beverage Amendment Act of 2004, D.C. Law 15–187 § 101 (2004)). D.C.Code § 25–603(a) provided that "the Board shall deny an application for a new license ... upon receiving valid written objections from the majority of registered voters residing within a 600–foot radius of the establishment to be licensed." Seven District of Columbia residents (including petitioner Foster) filed a referendum petition in opposition to Safeway's application. In addition, petitioner Green represented a group of residents who filed a protest to Safeway's application pursuant to D.C.Code § 25–601 (2001).[2] On July 23, 2003, the Board decided to hold the protest in abeyance until resolution of the referendum process.

On December 15, 2003, with the Board having authorized initiation of the referendum process, Mr. Holzsager, Ms. Green and other volunteers began the process of collecting signatures from registered voters who resided in the relevant area and who objected to Safeway's application. On January 24, 2004, petitioners submitted to the Board petitions bearing 269 signatures. As reported by the District of Columbia Board of Elections and Ethics, the number of registered voters residing in the relevant area was 617. Thus, the number of petition signatures was less than a majority of eligible registered voters as reported by elections officials. However, in a memorandum dated March 17, 2004, Alcoholic Beverage Regulation Administration Program Manager Laura Byrd advised the Board that, once adjustments were made for registered voters who had moved away, died, or been double-counted, there were only 506 eligible registered voters in the relevant area, meaning that 254 or more signatures would suffice for a majority. According to Byrd's memorandum, the submitted petitions included 269 "valid signatures."

On April 1, 2004, Safeway filed a challenge to the validity of the signatures pursuant to D.C.Code § 25–607 (2001). The Board scheduled a hearing on Safeway's challenge for June 30, 2004, but, at petitioners' request, rescheduled it for July 28, 2004. During the July 28, 2004 hearing, Safeway objected to the validity of the referendum petitions on a variety of grounds. Safeway took issue with the Alcoholic Beverage Regulation Administration Program Manager's recommendation that the Board rely on a number of registered voters that differed from the number reported by the Board of Elections and Ethics. Safeway also argued that some petition circulators had, in violation of then-applicable regulations (23 DCMR

---

tion of who (if anyone) other than Mr. Holzsager remains a petitioner need not be answered to resolve the issues before us, we do not address the issue further.

2. Advisory Neighborhood Commission 4B also filed a protest to the license application, but subsequently withdrew its protest.

§§ 1701, 1702.2(f), 1704.1 (1988)), failed to indicate in their affidavits whether they had received compensation for circulating the petition, failed to require each signer to print his or her name alongside his or her signature, and materially altered the petition. In addition, Safeway challenged the reliability of statements that petition circulators had obtained from persons who reported that registered voters shown on the Board of Elections and Ethics list had moved away or had died. At the end of the hearing, the Board closed the record to further submissions from the parties, and took the matter under advisement.

■ Meanwhile, on June 23, 2004, the Council of the District of Columbia had passed the Omnibus Alcoholic Beverage Amendment Act of 2004, D.C. Law 15–187 (the "Act"), with an effective date of September 30, 2004. The Act repealed D.C.Code §§ 25–603 through 25–608, thereby eliminating the referendum process as a means of challenging license applications. *See* D.C. Law 15–187, § 101(y); 51 D.C.REG. 9798 (Oct. 22, 2004). On February 1, 2006, with the Board still not having issued a decision on Safeway's challenge to the referendum petition or on Safeway's license application, Safeway filed a motion to dismiss the referendum petition on the basis of the Act. The Board dismissed the referendum petition on July 12, 2006,[3] stating that, in light of the change in the law, it "no longer possess[ed] jurisdiction" to deny a license on the basis of the referendum petition.[4]

Subsequently, the Board held hearings on the pending protest, during which multiple witnesses testified regarding the community-safety, quality of life, economic, and other implications of authorizing Safeway to sell wine and beer at the Piney Branch Road store. On September 20, 2007, the Board granted Safeway's license application subject to certain conditions. The Board declined to reconsider its decision.

## II.

■■ The primary issue on before us is whether the Board erred in dismissing the referendum petition on the basis of the Act, specifically, the Act's abolishment of the referendum process effective September 30, 2004. In determining whether the Board properly applied this change in the law to the referendum that was pending, we must begin by asking whether, in making this change, the Council of the District of Columbia "expressly prescribed the statute's proper reach." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). If the Council did so, "there is no need to resort to" rules of construction about whether a statute should be applied to pending cases

---

3. Referendum volunteers sought review by this Court in August 2006, but we dismissed the petition as premature because the protest proceeding remained pending before the Board.

4. While it is clear that the Act eliminated the referendum process as a mechanism for opposing the issuance of liquor licenses, the Board spoke with imprecision in saying that the Act constricted its "jurisdiction." An agency has "subject matter jurisdiction" over a case if it has "authority," pursuant to a legislative act, "to adjudicate the type of controversy presented by the case." *Davis &

*Assocs. v. Williams*, 892 A.2d 1144, 1148 (D.C.2006). A jurisdictional amendment "changes the tribunal that is to hear the case." *Hamdan v. Rumsfeld*, 548 U.S. 557, 577, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006) (quoting *Hallowell v. Commons*, 239 U.S. 506, 508, 36 S.Ct. 202, 60 L.Ed. 409 (1916)). In the wake of the Act, the Board retained authority to "adjudicate the type of controversy presented by [this] case," namely, whether a particular establishment should receive authorization to sell wine and beer. *Davis, supra*, 892 A.2d at 1148.

or given retroactive effect.[5] *Id.* If, however, the "statute contains no such express command," we must determine whether applying it to a pending case "would have retroactive effect, *i.e.,* whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id.* If a statute truly would have retroactive effect—a matter that is not always easy to determine[6]—the "traditional presumption teaches that it does not govern absent clear [legislative] intent favoring such a result." *Id.* Stated differently, the foregoing principles dictate that "the law in effect at the time a decision is rendered shall not be applied where 'doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary.'" *Scholtz P'ship v. District of Columbia Rental Accommodations Comm'n,* 427 A.2d 905, 914 (D.C.1981) (quoting *Bradley v. Richmond Sch. Bd.,* 416 U.S. 696, 711, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974)).

In *Bradley,* the Supreme Court instructed that, to evaluate whether a litigant is likely to suffer manifest injustice from the application of an intervening change in the law to a pending case, courts must consider: "(1) the nature and identity of the parties, (2) the nature of their rights, and (3) the nature of the impact of the change in law upon those rights." *Bradley, supra,* 416 U.S. at 717, 94 S.Ct. 2006. We applied the factors prescribed by *Bradley* in *Scholtz, supra.* We explained first that, in cases between private individuals, involving legislation that "purely affects the individual rights of two private parties vis a vis one another," a court "ought to struggle greatly to avoid a construction of the law which would affect the rights of the parties." *Scholtz, supra,* 427 A.2d at 915 (citing *United States v. Schooner Peggy,* 5 U.S. (1 Cranch) 103, 110, 2 L.Ed. 49 (1801)). However, in matters where one of the parties is a public entity charged with administering a regulatory program for the benefit of a community that includes the adverse parties, where the new legislation "is intended to redound to the benefit of all," and where the litigation involves a "great local concern," the general rule is that "the law in effect shall be given force." *Id.* at 915. In considering the nature of the rights affected by a change in the law, we recognized, a court "must refrain from applying an intervening change to pending petitions where to do so

**5.** As we observed in *District of Columbia v. Beretta U.S.A. Corp.,* 940 A.2d 163 (D.C.2008), retroactive civil legislation is subject to only "modest" constitutional limits. *Id.* at 179 (quoting *Landgraf, supra,* 511 U.S. at 272, 114 S.Ct. 1483). Accordingly, where the legislature has determined to give retroactive effect to a new law that it considers salutary, "[a]ctions . . . that are still pending and have not been reduced to judgment raise no concern with applying a 'new provision [that] attaches new legal consequences to events completed before its enactment.'" *Beretta,* 940 A.2d at 177 (quoting *Landgraf,* 511 U.S. at 270, 114 S.Ct. 1483). In such cases (as opposed to cases that "have reached final, unreviewable judgment"), *Beretta,* 940 A.2d at 176, "the legislative determination provides all the process that is due." *Id.* at 175–76 (quoting

*Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 432–33, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982)).

**6.** *See Landgraf, supra,* 511 U.S. at 267, 270 n. 24, 114 S.Ct. 1483 (noting that "deciding when a statute operates 'retroactively' is not always a simple or mechanical task," in part because "[e]ven uncontroversially prospective statutes may unsettle expectations and impose burdens on past conduct"; for example, "a new property tax or zoning regulation may upset the reasonable expectations that prompted those affected to acquire property; [and] a new law banning gambling harms the person who had begun to construct a casino before the law's enactment or spent his life learning to count cards").

would violate a right which had matured or become unconditional." *Id.* (citing *Bradley, supra,* 416 U.S. at 720, 94 S.Ct. 2006). We observed that a right "may reach this important plateau in any of four ways: (1) by the existence of a savings clause in the intervening legislation, (2) by judgment, (3) by statutory right, and (4) by ownership of property." *Id.* Finally, with respect to the impact of the new law on the rights of parties, the fact that the new law merely "alter[s] the procedure" by which a petitioner may obtain its objectives weighs in favor of applying the new law, unless "petitioners have reasonably and significantly altered their circumstances in reliance on the prior law." *Id.* at 918, 919; *see also Duvall v. United States,* 676 A.2d 448, 450 (D.C.1996) ("laws which provide for changes in procedure may properly be applied to conduct which predated their enactment").

■■ If a new statutory enactment is ambiguous as to the legislature's intent, and applying it to pending cases would not have a truly retroactive effect or result in manifest injustice, courts will defer to the responsible administrative agency's interpretation of the reach of the statute "so long as it 'represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute....'" *General Motors Corp. v. National Highway Traffic Safety Admin.,* 898 F.2d 165, 172 (D.C.Cir.1990) (quoting *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 845, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). Because the Board is charged with "administer[ing] and enforc[ing] the provisions of" Title 25 of the D.C.Code, *id.,* § 25–201(b), we accord "great weight" to the Board's construction of ambiguous provisions of that statute. *Coumaris v. District of Columbia Alcoholic Beverage Control Bd.,* 660 A.2d 896, 902 (D.C.1995). Thus, we will defer to

and uphold the Board's interpretation of Title 25 and legislative enactments affecting it as long as the interpretation "is reasonable and not plainly wrong or inconsistent with [the] legislative purpose." *Id.* at 899.

### III.

Applying the principles set out above, we are satisfied, for several reasons, that the Board did not err in concluding that it was required to dismiss the referendum petition in light of the Act.

### A.

■ To begin, although neither the Act nor its legislative history states specifically that the repeal of the referendum provisions (D.C.Code §§ 25–603–608) would require dismissal of any referendum petition that was already pending before the Act's effective date, the Council did specify, in the Act's prefatory statement, that a purpose of the Act was "to repeal the referendum process *in all circumstances.*" D.C. Law 15–187, 51 D.C.Reg. 6525 (July 2, 2004) (italics added). We have not previously held that a statement of purpose contained in such prefatory language is a clear indication of the legislative intent. Here, however, we think the prefatory language conveys the Council's intent to eliminate the referendum process without qualification, even as to petitions already circulated and pending before the Board, because no other meaning of the phrase "in all circumstances" suggests itself.

■ Petitioner Holzsager argues that this was not the Council's intent, as shown by a March 20, 2006 letter to the Board from then-Council Member Adrian Fenty, urging the Board not to dismiss the referendum petition relating to a license for Safeway's Piney Branch Road store because of passage of the Act. The short answer to this argument is that "post-

enactment commentaries warrant scant consideration in discerning legislative intent." *Qi–Zhuo v. Meissner*, 70 F.3d 136, 140 (D.C.Cir.1995) (citing *Washington County v. Gunther*, 452 U.S. 161, 176 n. 16, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981) ("We are normally hesitant to attach much weight to comments made after the passage of legislation")).[7] Nevertheless, assuming *arguendo* that the Council did not focus on whether repeal of the referendum provisions should affect the resolution of pending referendum petitions, we go on to consider the other factors that bear on whether the Act may properly be applied to the referendum proceeding in issue here.

### B.

■ Through the referendum process itself and the ensuing litigation, the petitioners have not sought to enforce a private right that they or the petition signers claim vis-a-vis Safeway, but rather have sought to vindicate the "great local concern" of the community in the vicinity of the Piney Branch Road store with respect to the creation of a new liquor-selling establishment in its midst. *Scholtz, supra*, 427 A.2d at 915. *Cf. Bradley, supra*, 416 U.S. at 718, 94 S.Ct. 2006 (explaining that "school desegregation litigation is of a kind different from 'mere private cases between individuals,'" such that it is "not appropriate to view the parties as engaged in a routine private lawsuit"). For its part, the respondent Board has acted not in a private capacity (as it might, for example, in a contract or property dispute), but in its role as administrator of the District's alcoholic beverage control program, the overarching objective of which is "to create a more peaceful and harmonious society."

Council of the District of Columbia, Committee on Consumer & Regulatory Affairs, Report on Bill 15–516, the Omnibus Alcoholic Beverage Amendment Act of 2004, at 37 (March 9, 2004) (hereinafter "Committee Report"). For these reasons, the "nature and identity of the parties" element of the *Bradley* analysis favors application of current public policy as reflected in the Act.

### C.

Consideration of the "nature of [petitioners'] rights" involved here supports the same conclusion. Petitioners argue that they had "an unconditional statutory right" under the Act to a decision on the merits of their referendum petition. They cite D.C.Code § 25–603(a), which provided that "the Board *shall deny* an application for a new license ... upon receiving valid written objections from the majority of registered voters residing within a 600–foot radius of the establishment to be licensed" (italics added). Petitioners also rely on D.C.Code § 25–607, which provided in subsection (a) that "[u]pon receiving completed petitions, the Board shall establish a period of 15 days during which the applicant or any other person may challenge the validity of the signatures" and in subsection (b) that "[w]ithin 15 days after the expiration of the challenge period, the Board shall determine whether the referendum meets the requirements of this chapter for denial of the license application, and if so, shall deny the license application." Petitioners contend that, at the very latest, fifteen days after the Board closed the record following the July 28, 2004 hearing on the referendum petition— *i.e.*, by mid-August, 2004, well before the effective date of the Act—the Board was

---

7. *See also Gersman v. Group Health Ass'n, Inc.*, 975 F.2d 886, 892 (D.C.Cir.1992) ("More bluntly put, a single member [of the legislature] may be attempting to reassure his own constituency or even to create legislative history for citation by courts").

required to determine whether the referendum met the requirements of section 25–603 and, if it did, to deny Safeway's license application. Since the Board made no finding by that time that the referendum petition was deficient, petitioners argue, the Board was required to deny, and petitioners had a statutory right to denial of, Safeway's license application.

This Court applied somewhat analogous reasoning with respect to the claims of one of the parties in *Scholtz, supra,* 427 A.2d 905, a case involving application of the District's rent-control laws. One of the landlords involved in the case had filed its so-called "hardship petition," for a rent increase pursuant to provisions of the Rental Accommodations Act of 1975,[8] approximately three months prior to that statute's March 16, 1978 expiration date. *Id.* at 913. Although the 1975 statute required the Rent Administrator to render a decision on such petitions within sixty days after they were filed, the Rent Administrator failed to act until about four months after the sixty-day deadline (approving the hardship petition, but at a lower level than that requested by the landlord). *Id.* at 913, 917. Because the Council had, by that time, replaced the 1975 statute with the Rental Accommodations Act of 1977,

the Rental Accommodations Commission reversed the Rent Administrator's decision, and subjected the landlord to the less favorable conditions for hardship increases established by the new statute. *Id.* at 909, 913. We observed that, when the landlord filed his petition more than sixty days before the effective date of the new law, the landlord "became unconditionally entitled to a decision" while the old law was in effect, and had a "vested . . . right to [a] decision under the provisions of" the previous law. *Id.* at 917. We held that because the landlord's right to a decision had "vested" before expiration of the 1975 statute, the agency's decision to apply the 1977 Act was manifestly unjust. *Id.* at 917.[9]

■ There is an important difference between the facts that led us to our conclusion in *Scholtz* and the facts of this case. The statute at issue in *Scholtz* provided that decisions on hardship petitions were to be made within sixty days after the petition was filed "unless an extension of time is approved in writing, by both the landlord and tenant of such rental unit or by the [Rental Accommodations] Commission"—language that conveyed the otherwise mandatory nature of the sixty-day deadline.[10] *Id.* at 917. By contrast, D.C.Code § 25–607(b) ("Within 15 days after the expiration of the challenge period,

8. This 1975 statute "provided that any landlord who had not obtained an 8% rate of return after an automatic rent increase could file a hardship petition to obtain an increase sufficient to raise his rate of return to the 8% level." *Scholtz, supra,* 427 A.2d at 910.

9. By contrast, we affirmed the application of the 1977 Act to three other landlords' hardship petitions because these landlords filed their petitions fewer than sixty days before the expiration of the 1975 Act. *See Scholtz, supra,* 427 A.2d at 918. Because these landlords were not entitled to a decision on their petitions before the March 16, 1978 expiration date of the 1975 Act, we explained, they had no "vested right to the procedures contained" in the earlier act.; the landlords' "mere ex-

pectation based on the anticipated application of existing law" did not justify departing from the general principle that "an administrative agency must apply the law in effect at the time of its decision in order to avoid sanctioning illegal conduct." *Id.* at 914.

10. Moreover, the provision was given added force by this Court's mandate, in *Apartment & Office Bldg. Ass'n of Metro. Washington v. Washington,* 343 A.2d 323, 333 (D.C.1975), that the District government "adopt and implement means of affording reasonably prompt vindication of [landlords'] cost pass-through right." *Apartment & Office Bldg. Ass'n of Metro. Washington v. Moore,* 359 A.2d 140, 141 (D.C.1976).

the Board shall determine whether the referendum meets the requirements of this chapter for denial of the license application, and if so, shall deny the license application"), contains no additional language that indicates that the deadline it imposes is mandatory rather than directory. That is significant, because this Court presumes that a statute is directory rather than mandatory if, like 25–607(b), it "impos[es] a time limit within which a public official must act [but] ... does not specify the consequences of noncompliance." [11] *Teamsters Local Union 1714 v. Public Employee Relations Bd.*, 579 A.2d 706, 710 (D.C. 1990); *see also Washington Hosp. Ctr. v. District of Columbia Dep't of Employment Servs.*, 712 A.2d 1018, 1019–20 (D.C. 1998).[12]

Further, notwithstanding the language in D.C.Code § 25–607(b) that the Board "shall deny" a license application if it determines "within 15 days after the expiration of the challenge period" that a referendum "meets the requirements of this chapter," D.C.Code § 25–607(c) (added to Title 25 in 1992) contained a provision that imposed a further condition on the success of a referendum petition. Section 25–607(c) stated that "[i]f the Board determines *at any time* that proponents, circulators, or signers of a petition acted due to motives that are inconsistent with the limitations set forth in § 25–604 [13] or any oth-

**11.** True, we have also said that "[d]elay coupled with actual prejudice," may overcome the presumption that statutory time limits on agency action are non-binding. *Spicer v. District of Columbia Real Estate Comm'n*, 636 A.2d 415, 418 (D.C.1993) (citing *In re Williams*, 513 A.2d 793, 796–97 (D.C.1986)). *Cf. Teamsters Local Union 1714, supra*, 579 A.2d at 711 (explaining that the court must conduct a "balancing test to determine whether any prejudice caused by agency delay is outweighed by the interests of another party or the public in allowing the agency to act after the statutory time period has elapsed") (citation omitted). However, this exception to the general rule does not assist us in resolving the issue before us because petitioners cannot show that the Board would have rejected Safeway's challenge to the referendum, and determined that the referendum petition met the requirements of law, if the Board had actually resolved the issues within fifteen days after the close of the July 28, 2004 hearing and before the Act went into effect. 2004. Thus, petitioners' situation is different from that of the landlord in *Scholtz* discussed above, because in that case the Rent Administrator had actually determined that the landlord made the showing necessary for a hardship increase under the old law; the problem was that the Rent Administrator issued his decision belatedly, after the new law had gone into effect. *See* 427 A.2d at 913.

**12.** We note in addition that, after the enactment of section 25–607 in 1987 (*see* District of Columbia Alcoholic Beverage Control Act Reform Amendment Act of 1986, D.C. Law 6–217 (1987), 34 D.C.REG. 2150 (Feb. 6, 1987)), the Board adopted regulations to implement the statute. *See* 35 D.C.REG. 5084 (June 24, 1988). 23 DCMR § 1705.4 provided that "within fifteen (15) calendar days from the end of the challenge period," the Board "shall ... determine whether the challenged petition signatures are valid." Without reference to a fifteen-day deadline, 23 DCMR § 1706.2 provided that "[w]hen the approved signatures on the petitions demonstrate that a majority of the registered voters object to the granting of the license sought, the Board shall deny the license." Thus, the Board's regulations divorced the Board's determination with respect to "a majority of the registered voters" from the fifteen-day deadline for determining whether "signatures are valid." Because the approach these regulations take is difficult to square with the statutory language, we do not rely on the regulations for the conclusion we reach here (even though, ordinarily, the interpretation reflected in the regulation would be entitled to "great weight [as] the contemporaneous interpretation of a challenged statute by an agency charged with its enforcement," *Bankamerica Corp. v. United States*, 462 U.S. 122, 130, 103 S.Ct. 2266, 76 L.Ed.2d 456 (1983)).

**13.** Section 25–604 required that the "basis for [an] objection" to a license application "shall be the reason that the issuance of the license

er provision of law, the Board shall declare the petition void." D.C.Code § 25–607(c) (italics added). This provision did more than simply mirror rules, such as those of many government agencies and courts,[14] that permit the rescission of benefits obtained through fraud or misrepresentation, because it gave the Board the authority to invalidate referendum petitions on the basis of "motives" that did not necessarily involve fraud. An examination of the pertinent legislative history reveals that, in enacting 25–607(c), the Council was aware that the new provision might threaten or erode the viability of the referendum process as a route to blocking the issuance of liquor licenses, but chose to tolerate that possibility. The Council explained that the new provision:

> would require nullification of an improperly-motivated petition whenever the Board discovers that the motive was inconsistent with the law. If a license had already been denied on the basis of the petition, the nullification would allow the application to be reconsidered....
>
> For example, nullification would be required if the Board received evidence that petitioners moved against a license applicant because the applicant refused to provide personal benefits they had sought. Even though the petition state-

ment may have listed reasons consistent with the appropriateness standards, if the Board determines that the denial of personal benefits was the true motive, the Board would be required to nullify the petition.

COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON CONSUMER & REGULATORY AFFAIRS, Report on Bill 9–125, the Alcoholic Beverage Control Amendment Act of 1992, at 11 (March 12, 1992). The Council adopted section 25–607(c) notwithstanding oral testimony and written statements warning that it would present a "danger that a licensee can use an alleged impropriety with regard to one signature to void a[n] opposing petition," and that neighborhoods would face a substantial burden if "they had to ensure that the motives of *all* signers and proponents were pure lest the entire petition be invalidated."[15] This history informs our view that, at least after the 1992 amendments to Title 25, the statute governing the referendum process did not create any "unconditional" or "vested" rights for its participants.

### D.

Consideration of the impact of the change in law upon the parties' rights also favors application of the current law. The Act deprived petitioners of the ability to

---

does not meet one or more of the appropriateness standards as set forth in §§ 25–313 (2001) [relating to the appropriateness of the establishment for the location, or the effect on real property values, peace, order, quiet, parking, and pedestrian safety], 25–314 (2001) [relating to the proximity of the establishment to places such as schools, recreation centers, day care centers, libraries, and similar facilities], 25–315 (2001) [relating to the record of compliance of a licensee seeking renewal of its license], and 25–316 (2001) [relating to the qualifications of an applicant seeking the transfer of a license]."

14. *See, e.g., Miranda v. Contreras*, 754 A.2d 277, 281 (D.C.2000) ("a judgment secured by

misrepresentations by one counsel to another ... warrant[s] relief" from the judgment); *Branch v. District of Columbia Dep't of Pub. & Assisted Hous.*, 661 A.2d 1102, 1103 n. 2 (D.C.1995) (noting that public housing benefits obtained through fraudulent means must be terminated).

15. Testimony of Robert Teir, Amer. Alliance for Rights & Responsibilities, and Statement of Charles R. Braun, Comm'r, on Bill 9–125, the "Alcoholic Beverage Control Amendment Act of 1991," before the Council of the District of Columbia, Committee on Consumer & Regulatory Affairs, April 26, 1991 (emphasis in the original).

defeat Safeway's license application through the referendum process, but it left them able to voice their objections through the protest process. Petitioners participated in that process and the Board considered their objections before it ruled on Safeway's application (and imposed on Safeway conditions apparently designed to take into account many of the objections).[16] At the same time, repeal of the referendum provisions "did not alter the Board's ... responsibility" and its "substantive obligation[,]" *Bradley, supra,* 416 U.S. at 721, 94 S.Ct. 2006, to disapprove the Safeway application if it found that an alcoholic beverage license was inappropriate for the location. *See* D.C.Code § 25–313(a). Moreover, as far as we can tell, petitioners have not "reasonably and significantly altered their circumstances in reliance on the prior law." *Scholtz, supra,* 427 A.2d at 919; *see also Bradley, supra,* 416 U.S. at 721, 94 S.Ct. 2006.[17] "Accordingly, upon considering the parties, the nature of the rights, and the impact of [the Act] upon those rights, it cannot be said that the application of the statute to [a referendum petition submitted] prior to its effective date, in an action pending on that date,

would cause 'manifest injustice.' " *Bradley, supra,* 416 U.S. at 721, 94 S.Ct. 2006.

### E.

Finally, we consider whether the Board's interpretation that the Act required it, in essence, to halt the referendum petition in its tracks was "reasonable and not plainly wrong or inconsistent with [the] legislative purpose." *Coumaris, supra,* 660 A.2d at 899. We have said that our "judicial deference [to an agency interpretation of its governing statute] is at its zenith when an administrative construction of a statute has been consistent and of long standing." *Id.* at 900. Application of that maxim here somewhat undermines our deference for the Board's interpretation because, although the Board undoubtedly was aware of the Act when it was still a bill and upon its passage and effective date, the Board waited more than two years after it was passed and almost two years after its effective date, before it determined that the Act required dismissal of the referendum petition. That said, the Board's interpretation is consistent with the legislative intent. The Committee Report accompanying the bill that became

16. The Board ordered that, as a "term of [its] license," Safeway would be required to (1) train cashiers on preventing the sale of liquor to minors; (2) refrain from posting advertisements for alcohol in its parking lot or on public space; (3) post signs on its premises regarding the minimum drinking age and the dangers of alcohol consumption during pregnancy; (4) confine its beer and wine products to certain aisles within its store; (5) place and maintain two large trash receptacles in front of its store; (6) pick up trash on its premises on a daily basis; (7) maintain 6 A.M. to 12 A.M. hours of operation; (8) operate and maintain a 32–camera electronic surveillance system; and (9) employ at least two security guards for the hours of 6 P.M. to 10 P.M.

17. Although petitioners represent (and we have no reason to doubt) that they expended considerable time and effort collecting signa-

tures from their neighbors during the cold winter months of December 2003 and January 2004, we cannot say that they incurred "extensive financial expenditures in reasonable reliance on the prior law to the extent that application of the law in effect at the time of decision would create manifest injustice." *Scholtz, supra,* 427 A.2d at 919; *see also Donahue v. District of Columbia Bd. of Psychology,* 562 A.2d 116, 123 (D.C.1989) (where petitioner was completing training in a field "related to psychology" at the time the Council revised the District's licensing laws to require a person to have a "degree in psychology" to practice as a psychologist, the denial of petitioner's license application was upheld, because "petitioner's reliance interest is not of sufficient magnitude to warrant protection against application of the 'unfair impact' of the new law").

the Act explains that the referendum process had been "extremely divisive in neighborhoods where it has been done," creating "nothing but strife and confusion," and that "the referendum process must be removed to ensure that the goals of ABC regulation can be achieved." Committee Report at 37. The Board quoted this language in explaining its conclusion that dismissal was required. In light of the Council's express remedial intent, we cannot say that the Board acted unreasonably in determining that the Act must be given effect even as to the pending referendum. See Landgraf, supra, 511 U.S. at 264 n. 16, 114 S.Ct. 1483 ("remedial statutes are to be liberally construed and if a retroactive interpretation will promote the ends of justice, they should receive such construction") (citation, brackets, and internal quotations marks omitted); see also id. at 285, n. 37, 114 S.Ct. 1483 ("We have sometimes said that new 'remedial' statutes, like new 'procedural' ones, should presumptively apply to pending cases"). We therefore affirm the Board's order dismissing the referendum petition.

## IV.

▬ Petitioners' second contention is that the Board's decision to grant Safeway's license to sell alcoholic beverages at the Piney Branch Road store violated the Act's ban on issuance of new liquor licenses to establishments located in Ward 4 of the District. See D.C.Code § 25–340

18. Enacted as section 101(o) of the Act, D.C.Code § 25–340 provides in pertinent part that "[n]o class A or B license shall be issued in or transferred into Ward 4; .... This section shall not apply to any application for a new or transferred license pending on [September 30, 2004]."

19. Although we have noted previously that an agency's unreasonable delay in taking required action may constitute a "denial" permitting judicial review, see Citizens Ass'n of Georgetown, Inc. v. Washington, 291 A.2d 699,

(Supp.2009).[18] This argument is without merit. By its express terms, the Act's Ward 4 ban did not apply to any application for a new license that was pending on September 30, 2004. Id. (brackets omitted). Since the Board had not granted or denied Safeway's May 2003 license application as of September 30, 2004, but instead had taken the matter "under advisement," the application was pending as of September 30, 2004, and thus was exempt from the ban.[19]

For the foregoing reasons, we affirm the decision of the Board dismissing the referendum petition and granting Safeway's license application.

*So ordered.*

705 n. 15 (D.C.1972), we have never before treated a delay in approval of a license application as a denial of the application for the purpose of determining whether that application was pending at the time a license moratorium went into effect. Cf. Georgetown Univ. Hospital v. Department of Employment Servs., 659 A.2d 832, 834 (D.C.1995) (emphasizing that statute permitted administrative delay to be treated as a denial "for purposes of appeal" only).