*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-AA-518

ASEFU ALEMAYEHU, PETITIONER,

v.

DISTRICT OF COLUMBIA
ALCOHOLIC BEVERAGE CONTROL BOARD, RESPONDENT.

On Petition for Review of an Order
of the District of Columbia Alcoholic Beverage Control Board
(CMP00321-11)

(Argued November 13, 2014                    Decided December 31, 2014)

*Richard J. Bianco* for petitioner.

*Jason Lederstein*, Assistant Attorney General, with whom *Irvin B. Nathan*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General, and *Loren L. Alikhan*, Deputy Solicitor General, were on the brief, for respondent.

Before THOMPSON and MCLEESE, *Associate Judges*, and NEWMAN, *Senior Judge*.

Opinion for the court by *Associate Judge* THOMPSON.

Opinion by *Associate Judge* MCLEESE, concurring in part and dissenting in part, at page 19.

THOMPSON, *Associate Judge*:  Petitioner Asefu Alemayehu appeals from the

February 27, 2013, decision of the Alcoholic Beverage Control Board revoking her

Retailer's Class CT license to serve alcoholic beverages, and from the Board's April 17, 2013, order denying Petitioner's motion for reconsideration. Petitioner contends that the Board's decision should be vacated (1) because the Board's decision-making was inappropriately tainted after Board members heard her offer in compromise and (2) after they learned that she also faced a pending investigation in another matter; (3) because she lacked the English proficiency required to understand the Board proceeding and to make a knowing waiver of her rights (the "language issue"); and (4) because the penalty of revocation was not commensurate with the nature of the charged offense. For the reasons discussed below, we reverse and remand.

## I.  Background

According to the Notice of Status and Show Cause Hearing issued to Petitioner on May 9, 2012, an Alcoholic Beverage Regulation Administration investigator visited Petitioner's restaurant at approximately 3:49 am on Tuesday, July 5, 2011. From outside, the investigator watched someone lock the restaurant's front door and observed several individuals inside holding beer bottles. Upon entering the restaurant, the investigator witnessed approximately twenty individuals consuming alcoholic beverages. The investigator approached

Petitioner, the owner of the restaurant, who told him that "she was unaware of the time." The relevant District of Columbia statute required that, on the weekday in question, alcohol consumption on the premises stop at 2:00 am. D.C. Code § 25-723 (b) (2001); *see also* 23 DCMR § 705.9.

At the first Show Cause Hearing, held on December 12, 2012, Petitioner was represented by Wendell Robinson. Robinson told the Board that he had just realized that Petitioner did not speak English well enough to understand his advice or explanations.[1] He said that Petitioner had "indicated she could understand [him]" during their meetings, and he had taken her at her word, even though she sometimes displayed a "look of bewilderment." However, the day before the hearing, Robinson's associate met with Petitioner and, with the aid of an interpreter, discovered that Petitioner was "[un]aware that she could lose her license and not be able to reapply for five years." This result indicated to Robinson that Petitioner had overstated her ability to understand their previous conversations. In light of his need to properly prepare and advise his client again, now with the assistance of an interpreter, Robinson requested a continuance. At no point during this hearing did Robinson mention the District of Columbia

---

[1] Ms. Alemayehu speaks Amharic.

Interpreter Act, D.C. Code § 2-1902 (c) (2001). The Board granted the continuance request.

At the second Show Cause Hearing, held on January 9, 2013, Petitioner was represented by Andrew Kline. Kline and Assistant Attorney General Fernando Rivero presented to the Board an offer in compromise,[2] under which Petitioner would pay a $3,000 fine, be subject to a 10-day suspension of her license, and submit an application for transfer of her license within 60 days.[3] Kline explained that allowing Petitioner to "move on from this business" through a license transfer

---

[2] *See* 23 DCMR § 1604.5, which provides that:

> The Board may, in its discretion, accept from both (1) the licensee or permittee and (2) the Office of the Corporation Counsel or the prosecuting entity an offer in compromise and settlement to resolve the charges brought at the show cause hearing by the District of Columbia against the licensee. An offer in compromise and settlement may be tendered to the Board at any time prior to the issuance of a decision by the Board on the contested matter.

[3] *See generally* D.C. Code §§ 25-405, 25-316 (2001) (governing the process of voluntary transfer of licensed establishment to a new owner); *see also* D.C. Code § 25-405 (e) (2001) (providing that "[i]f the Board finds that the licensee is in violation of this title or regulations promulgated under this title, the Board shall deny the application for transfer").

was "a very important component of the offer, given the investigative history"[4] and "other factors," including the fact that "[t]here is another investigative matter in the pipeline[.]" Rivero also referred to the "pipeline" matter, explaining that the pending "case concern[ed] an incident that took place in July of [2012]." At this point, a Board member interjected, cautioning his colleagues not to consider the existence of pending cases when ruling on the offer in compromise, as "the fact that there is something in the pipeline is irrelevant to this case."

Before ruling on the offer in compromise, Board member Jones, *sua sponte*, asked Kline whether his client needed an interpreter, recalling that the previous Show Cause hearing was continued because "there was a concern about a translator . . . being necessary or required[,]" as "it wasn't clear that the licensee clearly understood all the nature of the discussions that were being had between her and her counsel[,]" and Petitioner possibly "wasn't in the position to clearly understand all the discussions that were being had by us as a Board[.]" The Board member sought to "establish on the record that no translator is necessary[.]" The Board Chair asked Kline to address the issue. Kline responded:

---

[4] Petitioner was appearing before the Board for her fourth primary-tier offense. Her previous offenses were adjudicated on September 25, 2008, May 6, 2009, and April 14, 2010. The dates of her previous offenses were September 11, 2007, January 18, 2009, and February 7, 2009.

The only way that I can address that is I have spent a great deal of time with Ms. Alemayehu. I'm satisfied that she understands the terms of the deal. I'm happy to have her answer any questions that the Board may have, so that the Board might be satisfied. . . . [I]n this case, given the time that I have spent with her in our review of the offer and other considerations, I don't have a question in my mind at this point.

Board member Alberti pressed Kline on this point, resulting in the following exchange:

Member Alberti: But what I'm not hearing from you is if we were to not accept this [offer in compromise], the question is, still in my mind which you haven't addressed, would your client understand English well-enough to understand the proceedings that we would be having? Because that's the real question here, Mr. Kline.

Mr. Kline: Yes.

. . .

I beg your indulgence. Ms. Alemayehu is willing to make a statement that she does understand what is going on and understands the nature of the proceeding and will understand what is going on here. . . . I can tell you with respect to this offer [in compromise] and the discussions and preparations, I'm comfortable. . . .

Chairperson Miller: -- would your client be able to participate in the hearing?

Mr. Kline: Yes.

The Board never asked Petitioner to make a statement on the record. After Board member Alberti expressed satisfaction with Kline's assurances, the Board proceeded to discuss and then reject both the original offer in compromise and an amended offer in compromise proposed by Kline, in which the fine was increased to $4,000.

The Show Cause Hearing immediately followed. Kline told the Board in his opening statement that he would "stipulate to the facts that are asserted in the notice," as his client sought only to "address the appropriate penalty to be served." In light of this stipulation, the government waived opening statements, presented no evidence, and did not give a closing. In Kline's closing, he reminded the Board that Petitioner intended to transfer her license; observed that it was clear that Petitioner "had difficulty running" her business; and said that Petitioner "t[ook] responsibility for the violation," which was why she did not "put[] the Government to its proof."

In its February 27, 2013, Findings of Fact, Conclusions of Law, and Order ("Order"), the Board found that Petitioner violated D.C. Code § 25-723 (b), which proscribes serving alcohol after 2:00 am on weekdays. The Board revoked Petitioner's license, explaining that it did so both pursuant to its "discretionary

revocation powers"[5] and as mandated by D.C. Code § 25-830 (c)(3) (2012 Repl.).[6]

The Board also denied a Motion for Reconsideration filed on Petitioner's behalf by

her original attorney, Mr. Robinson, who argued *inter alia* that, because of the lack

of an Amharic interpreter at the Show Cause Hearing, Petitioner "was unable to

make a knowing and intelligent agreement to stipulate[] to the charges[.]"

Petitioner timely appealed.

## II. Analysis

---

[5] The Board cited D.C. Code § 25-823 (2012 Repl.) (providing that "[t]he Board may fine, as set forth in the schedule of civil penalties established under § 25-830, and suspend, or revoke the license of any licensee during the license period" for violations of law).

[6] At the time of the Board's Order, then-recently amended D.C. Code § 25-830 (c)(3) read: "A licensee found in violation of a primary tier offense for the 4th time within 4 years shall have the license either revoked or fined no less than $30,000 and suspended for 30 consecutive days." Omnibus Alcoholic Beverage Regulation Emergency Amendment Act of 2012, D.C. Law 19-597, 60 D.C. Reg. 1001, 1012 (Feb. 1, 2013) ("Emergency Act") (effective January 14, 2013 – April 14, 2013); *see also* Omnibus Alcoholic Beverage Regulation Amendment Act of 2012, D.C. Law 19-310, 60 D.C. Reg. 3410, 3422 (Mar. 15, 2013) (making permanent the language passed in the Emergency Act, effective May 1, 2013). In its Order, the Board quoted the earlier version of the statute, which provided that "[a] licensee found in violation of a primary tier offense for the fourth time within 4 years shall have the license revoked." D.C. Code § 25-830 (c) (2012 Repl.).

We ultimately dispose of this case on the basis of the language issue, but briefly address the other issues Petitioner has raised, which otherwise could be issues again on remand.

## A.     The Board's Having Heard the Offer in Compromise

Asserting that the Board acted as "both the mediator and the fact-finder" when it heard her offer in compromise, rejected it, and then moved directly on to the Show Cause Hearing, Petitioner suggests that the Board thereby became a biased decision-maker.  We reject this argument.  First, the record does not support Petitioner's assertion that, through the offer in compromise, she "stipulated to many facts which she could have disputed" in the Show Cause Hearing.  In reality, when proposing the offer in compromise, Petitioner's attorney acknowledged Petitioner's history of three previous primary-tier violations, the existence of which was not in dispute, and mentioned the "pipeline" investigation, but did not stipulate to the facts of the July 2011 incident until after the Board had denied the offer in compromise.[7]  Before moving on to the Show Cause Hearing, the Board heard

---

[7]  Moreover, the Board did not act as a mediator.  A mediator "tries to help disputing parties reach an agreement."  Black's Law Dictionary 1120 (10th ed. 2014).  That was not the Board's role; it was presented with an offer in

(continued…)

merely that Petitioner sought to settle her case. This desire did not mean that she admitted guilt, as her actions could have been fueled by any number of motives, including an intention to quickly sell her business.

Second, the Board's "mixing of [investigatory, prosecutorial, and adjudicative] functions . . . is a necessary part of the administrative scheme and does not *per se* violate due process." *James Bakalis & Nickie Bakalis, Inc. v. Simonson*, 434 F.2d 515, 518 (D.C. 1970) (citation omitted). A petitioner contending that an agency board was inappropriately biased by the exercise of another function "must overcome a presumption of honesty and integrity in those serving as adjudicators[.]" *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). Petitioner has not carried this burden. *Park v. District of Columbia Alcoholic Beverage Control Bd.*, 555 A.2d 1029, 1032 (D.C. 1989) ("[I]t is not *per se* improper for an official who holds two governmental positions, . . . to become involved in both the investigation and determination of the same case.").[8]

---

(…continued)
compromise that has been negotiated between Petitioner's attorney and the Office of Attorney General.

[8] Petitioner also contends that her rights were violated when the Board learned that she faced an additional investigation for an alleged violation that occurred in July 2012. Her argument boils down to an assertion that the Board violated the D.C. Administrative Procedure Act — and her procedural rights

(continued…)

**B.**     **The Language Issue**

Petitioner contends that she should have been provided with an interpreter at the hearing, basing her claim on D.C. Code § 2-1902 (c), which provides that an agency conducting an administrative proceeding "shall appoint a qualified interpreter upon the request of [a] communication-impaired" party or witness. D.C. Code § 2-1902 (c).   The record belies Petitioner's argument that she requested an interpreter for the Show Cause Hearing.   We therefore reject the argument that § 2-1902 (c) applied in the way Petitioner has argued.

Section 2-1902 (c) also provides, however, that "[w]henever a communication-impaired person is a party or a witness in an administrative

---

(…continued)

thereunder — by admitting and then considering irrelevant evidence. *See* D.C. Code § 2-509 (b) (2001) (providing that agency bodies are instructed to "exclude irrelevant . . . evidence"). We reject this argument as well. An agency does not admit irrelevant evidence to the record merely by hearing of its existence. Nor does an adjudicator become impermissibly "tainted" merely by hearing irrelevant evidence. The burden is on Petitioner to "overcome the presumption that the Board members acted fairly" in deciding her case. *Park*, 555 A.2d at 1032. Petitioner cannot meet that burden as to the January 9, 2013, Show Cause Hearing because a Board member promptly reminded his colleagues that they should not consider a future case when ruling upon a current one, and there is no indication anywhere in the hearing transcript or the Board's Order that the Board did anything other than follow those cautionary words.

proceeding . . . ,'' the agency conducting the proceeding "*may* appoint a qualified interpreter . . . .'' D.C. Code § 2-1902(c) (emphasis added). It thus vests the Board with discretion to appoint an interpreter for a communication-impaired party. Discretionary authority must be reasonably exercised in conformance with the purpose of the authorizing statute. *See In re D.H.*, 666 A.2d 462, 470 (D.C. 1995). Because the Council of the District of Columbia ("Council") passed the Interpreter Act "in order to vindicate the constitutional [due process] rights" of individuals who cannot speak or understand English, *Ramirez v. United States*, 877 A.2d 1040, 1043 (D.C. 2005), the Board was required to exercise its discretion as to whether to appoint an interpreter in a way that protected Petitioner's due process rights. We conclude that the Board's effort fell short.

To be sure, it is by no means clear from the record that Petitioner was or is a communication-impaired person within the meaning of the Interpreter Act. We do not suggest but also cannot discount the possibility of gamesmanship, i.e., that Petitioner raised the language issue only after seeing the severe penalty the Board imposed in order to get a second bite at the apple. We also recognize that Petitioner was not a newcomer to Board processes, having had three earlier primary-tier offenses adjudicated. But here, Board members themselves, having been apprised by Petitioner's original counsel of her apparent lack of

understanding of his advice given in English, expressed concern about whether Petitioner was able to understand and would be able to participate in the proceedings if the matter went to hearing. In his detailed answer to the Board's inquiry, Petitioner's attorney Kline expressed satisfaction that Petitioner understood "the terms of the deal" — i.e., the terms of the offer in compromise. He gave a one-word answer ("Yes"), however, when a Board member asked whether Petitioner would be "able to participate in the hearing" if the Board did not accept the offer in compromise. Then, when the hearing commenced moments later, Mr. Kline short cut the proceeding by immediately stipulating to the charged violation. Petitioner did not participate at all, and, not having spoken during the hearing, said nothing that evidenced her ability to participate and understand.

Moreover, although Kline suggested that Petitioner was willing to make a statement to the Board "that she does understand what is going on and understands the nature of the proceeding and will understand what is going on here[,]" the Board declined the invitation (which would have imposed a very slight burden) and asked Petitioner no questions. If, as her original counsel suggested, Petitioner had limited English proficiency and, in fact, could not understand the exchanges between Kline and the Board, "then the [hearing], to [her], [was] no more than 'a babble of voices.'" *Ko v. United States*, 722 A.2d 830, 834 (D.C. Cir. 1998)

(quoting *United States ex rel. Negron v. New York*, 434 F.2d 386, 388 (2d Cir. 1970)). Having heard contrary representations from Petitioner's different attorneys and having received a very limited assurance from attorney Kline, the Board lacked a firm factual foundation on which to determine whether it needed to exercise its discretion to appoint an interpreter. See *Johnson v. United States*, 398 A.2d 354, 364 (D.C. 1979) (explaining that determinations committed to the fact-finder's discretion require "rational acts of decision-making[,]" and that "[a]n informed choice among the alternatives requires that the [decision-making] be based upon and drawn from a firm factual foundation").

In this circumstance, Petitioner is entitled to a remand for the Board to determine, first, whether she was communication-impaired at the time of the Show Cause Hearing and, if the Board determines that she was, to the opportunity for a new hearing (with an interpreter as necessary).[9] We recognize that, to date, Petitioner has not suggested what defense(s) she might have to the charged infraction. However, if she was unable to understand the January 9, 2013, hearing,

---

[9] If the Board finds that Petitioner was not communication-impaired at the time of the January 9, 2013, Show Cause Hearing, it may reinstate its finding that Petitioner committed the charged infraction.

she is at least entitled to put the government to its proof during a Show Cause Hearing in which she is able to understand the proceedings.

Further, Petitioner *may* be entitled to an opportunity to persuade the Board to impose a fine of at least $30,000 and a 30-day suspension, as specifically authorized by amended § 25-830 (c)(3), rather than revocation.[10] We say "may" because, as discussed at oral argument, there is an issue as to whether the Board had discretion to impose such a fine in lieu of revoking Petitioner's license. As noted *supra* in note 6, by the time the Board issued its Order in February 2013, § 25-830 (c)(3) had been amended to prescribe such a fine and suspension as an alternative penalty for a fourth primary-tier offense within four years. However, without acknowledging or explicitly considering whether it should give effect to the amended § 25-830 (c)(3), the Board imposed the sole penalty — license revocation — that was mandated by the superseded § 25-830 (c)(3). While it is true that the Board also based the revocation penalty on its "discretionary . . . powers," if the additional option prescribed by amended § 25-830 (c)(3) was applicable and the Board did not consider it, it did not properly exercise its

---

[10] At oral argument, modifying the argument made in Petitioner's brief that the revocation penalty was not commensurate with the charged violation, Petitioner's counsel contended that the Board should have considered imposing this less severe (in Petitioner's estimation) penalty.

discretion. *See Johnson*, 398 A.2d at 365 (explaining that to exercise its discretion in a rational and informed manner, the trier of fact must be aware of the "range of permissible alternatives").

A variety of considerations are relevant to determining whether amended § 25-830 (c)(3) was applicable. "[W]here the legislature has determined to give retroactive effect to a new law that it considers salutary, actions that are still pending and have not been reduced to judgment raise no concern with applying a new provision that attaches new legal consequences to events completed before its enactment." *Holzsager v. District of Columbia Alcoholic Beverage Control Bd.*, 979 A.2d 52, 57 n.5 (D.C. 2009) (internal quotation marks, bracket, ellipsis, and citation omitted). But if the Council did not "expressly prescribe[] the [amended] statute's proper reach," *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994), resort must be had to other principles that are relevant to whether a statutory amendment should be applied to a pending case. *Holzsager*, 979 A.2d at 56-57. One general rule, "in matters where one of the parties is a public entity charged with administering a regulatory program for the benefit of a community" and "the new legislation is intended to redound to the benefit of all," is that "the law in effect shall be given force." *Id.* at 57 (internal quotation marks omitted). But there are also "the canon that '[a] statute imposing a new penalty . . . will not be

construed as having a retroactive effect;' and the countervailing rule that '[r]emedial statutes are to be liberally construed and if a retroactive interpretation will promote the ends of justice, they should receive such construction.'" *Landgraf*, 511 U.S. at 263 n.16 (citation omitted).

Petitioner appears to regard the 2013 amendment to § 25-830 (c)(3) as remedial legislation that affords licensees the opportunity for a less severe penalty for a fourth primary-tier violation. By contrast, the relevant legislative history suggests that the Council viewed the amendment as "[e]stablish[ing] a stricter penalty for a fourth primary tier offense within four years[,]"[11] language that may support an interpretation that amended § 25-830 (c)(3) created a new penalty that should not be applied to an infraction that pre-dated it. Respondent's brief suggests that the Board was not bound to apply amended § 25-830 (c)(3) because, at the time of its Order, the Board had not yet promulgated a conforming regulation. *See* Respondent's Brief at 21 n.7 ("The prior rule that was operative for this case only allowed for revocation.").[12]

---

[11] D.C. Council Committee on Human Services, Report on B19-824 at 24 (Nov. 8, 2012).

[12] The basis of this argument appears not to be the (wholly) untenable suggestion that agency regulations can "trump" a statute, but the perhaps less untenable suggestion that D.C. Code § 25-830 (g) defers the effective date of

(continued…)

The Board did not explicitly consider any of the foregoing points. We conclude that "[i]n accordance with our usual practice, we [should] not attempt to [decide the issue of the retroactive effect of amended § 25-830 (c)(3)] before the agency charged with administering [the statute] has done so[.]" *Brown v. District of Columbia Dep't of Emp't Servs.*, 83 A.3d 739, 751-52 (D.C. 2014). "The interpretation . . . should be made, in the first instance, by the agency." *Id.* at 752 (internal quotation marks and citation omitted). We direct that, if the Board's finding that Petitioner violated D.C. Code § 25-723 (b) is reinstated, or, if the Board finds after a new hearing that she violated § 25-723 (b), then the Board must determine whether the amended § 25-830 (c)(3) applies to Petitioner's case. If the Board determines that the amended version does apply, then, in fashioning a sanction, the Board must consider as one option whether it should impose a fine of at least $30,000 in lieu of revoking Petitioner's license.

The matter is remanded for further proceedings consistent with this opinion.

---

(…continued)

statutorily established fines by providing that "[t]he schedule [of fines established by the Council] and any [Board] amendments to the schedule[, which are authorized by § 25-830 (f),] shall be published in the District of Columbia Register and promulgated by the procedure adopted under § 25-211 (e)." D.C. Code § 25-830 (g).

*So ordered.*

MCLEESE, *Associate Judge*, concurring in the judgment in part and dissenting in part:

I agree with the court that the Board's ruling in this case was not tainted by the Board's awareness that petitioner Alemayehu had offered to settle the case and faced an investigation in another matter. I also agree with the court that the case should be remanded for the Alcohol Beverage Control Board to determine whether petitioner Alemayehu is a communication-impaired person within the meaning of the local statute governing the appointment of interpreters in judicial and administrative proceedings, D.C. Code § 2-1901 *et seq.* (2012 Repl.). I write separately on the latter point to provide a brief explanation of my reasoning. First, at the December 2012 show-cause hearing before the Board, an interpreter translated the proceedings for Ms. Alemayehu. At the same hearing, Ms. Alemayehu's attorney represented to the Board that his client did not understand English well enough to understand his advice and explanations. Taken together, these circumstances put the Board on notice of substantial grounds for concern that Ms. Alemayehu was a communication-impaired person. *Cf., e.g., United States v.*

*Tapia*, 631 F.2d 1207, 1209-10 (5th Cir. 1980) (where defendant had benefit of interpreter at arraignment, trial court erred by failing to inquire about defendant's need for interpreter in later proceedings). Second, even in the absence of a request, the Board had discretion to appoint an interpreter for Ms. Alemayehu in connection with the subsequent proceedings before the Board. D.C. Code § 2-1902 (c). Third, in light of the grounds for concern, the Board was obliged to inquire into whether Ms. Alemayehu was a communication-impaired person. *Cf., e.g.*, *Luna v. Black*, 772 F.2d 448, 451 (8th Cir. 1985) (per curiam) ("When a trial court is put on notice that there may be some significant language difficulty, the court should determine whether an interpreter is needed . . . .") (internal quotation marks omitted). Fourth, simply accepting the reassurance given by Ms. Alemayehu's new attorney was not an adequate inquiry, given the prior use of an interpreter and the conflict between the new attorney's reassurance and the representations of previous counsel. At a minimum, the Board should have inquired directly of Ms. Alemayehu. *Cf., e.g.*, *Bates v. United States*, 834 A.2d 85, 95-96 (D.C. 2003) (trial court abused discretion by failing to conduct further inquiry on issue of juror bias; given conflict between testimony of one witness and proffer of counsel as to testimony of another witness, trial court was required to hear directly from latter witness and to conduct whatever other inquiry was needed in order to have "firm factual foundation" for ruling).

I respectfully dissent from the court's disposition of petitioner's belated contention that, in revoking Ms. Alemayehu's license, the Board abused its discretion by failing to consider the potential applicability of a 2013 amendment to D.C. Code § 25-830 (c)(3) (in cases involving licensee's fourth primary-tier violation, permitting Board to suspend license and impose substantial fine, rather than revoking license).  Ms. Alemayehu apparently never brought that amendment to the Board's attention.  Nor did Ms. Alemayehu rely on that amendment in her brief in this court, instead simply arguing in a conclusory manner that license revocation was an unreasonably harsh sanction.  The Board did mention the amendment in its brief in this court, arguing that the amendment was inapplicable. Ms. Alemayehu did not file a reply brief.  It was not until oral argument in this court that Ms. Alemayehu first contended that the Board erred by failing to consider the 2013 amendment.  Under well settled principles, this court normally would not consider a claim raised so belatedly.  *See, e.g.*, *D.C. Library Renaissance Project/West End Library Advisory Grp. v. District of Columbia Zoning Comm'n*, 73 A.3d 107, 124 n.9 (D.C. 2013).  I see no extraordinary circumstances justifying a departure from these well settled principles.  To the contrary, any assumed error by the Board in failing to consider the 2013 amendment would clearly be harmless, given that the Board expressly concluded,

in the exercise of its discretion, that revocation rather than fine or suspension was the proper sanction. I understand that, at the time the Board reached that conclusion, the Board may not have been considering the possibility of a fine as large as would be permissible under the 2013 amendment. But I see no reason to suppose that the Board would have been inclined in this case to forgo revocation in favor of suspension and a larger fine. Rather, in revoking Ms. Alemayehu's license, the Board explained that Ms. Alemayehu had "shown she cannot comply with the law, and that she has no regard for public safety, or the quality of life of residents." Under the circumstances, remanding to require the Board to consider the potential applicability of the 2013 amendments would be unwarranted even if Ms. Alemayehu had properly presented this issue to the Board and to this court. *Cf., e.g.*, *Le Chic Taxicab Co. v. District of Columbia Taxicab Comm'n*, 614 A.2d 943, 945 (D.C. 1992) (per curiam) (remand warranted "only if substantial doubt exists whether the agency would have made the same ultimate finding with the error removed") (internal quotation marks omitted).

In sum, I would remand for the Board to determine whether Ms. Alemayehu is a communication-impaired person. If so, the Board would have to conduct new proceedings, and in that setting the Board could appropriately consider the potential applicability of the 2013 amendments. But if Ms. Alemayehu is not a

communication-impaired person, then in my view the Board should be permitted to reinstate the prior order in its entirety.